857 A.2d 1198

**James SMITH and Jason Mack**

v.

**STATE of Maryland.**

**No. 330, Sept. Term, 2003.**

Court of Special Appeals of Maryland.

Sept. 15, 2004.

674

Allen E. Burns (Stephen E. Harris, Public Defender, on the brief), Baltimore, for Appellant.

Shannon E. Avery (J. Joseph Curran, Jr., Attorney General, on the brief), Baltimore, for Appellee.

Panel: DAVIS, EYLER, JAMES R., ADKINS, JJ.

EYLER, JAMES R., J.

On February 24–25, 2003, James Smith ("Mr. Smith") and Jason Mack ("Mr. Mack"), appellants, were tried together by a jury in the Circuit Court for Baltimore City. Mr. Smith was convicted of attempted robbery, assault in the second degree, and attempted theft of under five hundred dollars. After merging the assault and attempted theft convictions, the court sentenced Mr. Smith to six years' imprisonment, all but two years suspended, followed by three years' probation, for the attempted robbery conviction. Mr. Mack was convicted of attempted robbery, assault in the first degree, and attempted theft of under five hundred dollars. After merging the assault and attempted theft convictions, the court sentenced Mr. Mack to six years in prison for the attempted robbery conviction.

On appeal, appellants seek to have their convictions reversed, based on alleged errors by the trial court. The victim of the crime, who is White, identified appellants, who are African American, as the assailants. Appellants argue that the court erred in refusing to instruct the jury on the difficulties of cross-racial identification. In addition, appellants argue that the court erred in barring defense counsel from referring to the difficulty of cross-racial identification in closing argument.

Perceiving no reversible error, we shall affirm the judgments of the circuit court.

## Facts

The following testimony was adduced at trial. Christine Crandall ("Ms. Crandall") testified for the State that she arrived at her home in the Fells Point area around 10:30 p.m. on the night of May 8, 2002. As she secured the gate to the area where she parked, she noticed two men walking towards her on the other side of the street. She said, "Hey guys," and testified that they appeared "normal." She stated that, "[t]hey looked great. They looked fine." Ms. Crandall described Mr. Smith as wearing a gray baseball hat and a "grayish long baggie sweat shirt and long oversized pants." She said Mr. Mack was wearing a "dark bluish" sweat shirt, jeans, and no hat. Ms. Crandall testified that there were street lights, so she could see Mr. Smith's face, despite his hat, and that his features made him "pretty distinctive looking."

When the men approached Ms. Crandall, Mr. Smith grabbed the hand in which Ms. Crandall held her car keys, but she maintained a tight fist around the keys. Mr. Mack held a gun, and said, "[g]ive me your keys, bitch. I'll shoot you." Ms. Crandall maintained eye contact with Mr. Mack as she repeatedly said, "[y]ou don't want to do this."

Ms. Crandall's neighbor, Mary Jo Slowey, interrupted the robbery when she called from her second-floor window to ask if Ms. Crandall was okay. Ms. Crandall said, "call 911, they have got a gun." Following this interaction, both men started to walk away, but Mr. Mack turned and pointed the gun at Ms. Crandall again. Ms. Crandall testified that she was able to observe his face and his eyes again, and that the entire incident lasted about four minutes.

Ms. Crandall testified that she was certain that appellants were the individuals who attempted to rob her. She explained her certainty by stating that, "I'm extremely good with faces." She testified that her background in art and "painting people" led her to look for distinctive physical features and postures in people.

Detective Randolph Wynn testified that he was assigned to the investigation of the attempted robbery. Two days after

the incident occurred, Detective Wynn met with Ms. Crandall and showed her a photo array, including a photo of an individual whom he believed might have been involved in the attempted robbery.[1]  Ms. Crandall wrote on the photos "Out of these 6 photos, I do not recognize the ones who attempt[ed] to car jack me."

Detective Wynn continued to investigate possible suspects, and following the receipt of certain information, prepared two additional photo arrays, which included pictures of each appellant.  On May 23, 2002, from these photo arrays, Ms. Crandall identified Mr. Mack as the man who held the gun, although she noted that his hair was different,[2] and she identified Mr. Smith as the man who tried to take her keys.  On the back of Mr. Mack's photo, Ms. Crandall wrote "He looks very much like the man who had the gun and attempted to rob me.  The hair is changed but still looks like the man."  On the back of Mr. Smith's photo, she wrote, "This looks like the man wearing the hat that attempted to rob me.  He tried to take the keys from my hand while the other man held the gun to me."  Detective Wynn testified that when Ms. Crandall identified Mr. Mack, she said she was sure he was the person who pointed the gun at her, and when she identified Mr. Smith, she said she was sure he was the person who tried to take her keys.

Ms. Crandall's neighbor, Mary Jo Slowey, testified that when she looked out her window to check on Ms. Crandall, she could see that there were two people on the street with Ms. Crandall, but she could not tell the race or gender of the two individuals.

---

**1.**  Detective Wynn believed this individual might have been involved because he lived in the area, had been arrested in the vicinity, a van he was suspected of taking had been found nearby, and he "generally" fit a description given by Ms. Crandall.

**2.**  On the night of the incident, Ms. Crandall stated that the man with the gun had "dreds."  In the photo that she picked from the array, Mr. Mack appeared to have his hair in cornrows, rather than dredlocks.

Officer Kevin Evans testified on behalf of Mr. Smith, stating that when he responded to the call about the attempted robbery, Ms. Crandall stated that she could draw a sketch of the armed suspect, but not the unarmed suspect.

Following their convictions and sentencing, appellants filed a timely appeal to this Court.

## Questions Presented

Appellants raise the following two questions on appeal:

1. Did the trial court err in refusing to instruct the jury on cross-racial identification?

2. Did the trial court further err in barring defense counsel from referring in closing argument to the difficulty of cross-racial identification?

## Discussion

### Jury Instructions

At the outset, we want to make it clear that this case is not about the reliability of eyewitness testimony generally. This subject has been addressed in many cases, law review articles, reports on the results of studies, and treatises. With respect to cases, *see, e.g., Manson v. Brathwaite,* 432 U.S. 98, 111–112, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977) (discussing "the [Supreme] Court's concern with the problems of eyewitness identification."); *U.S. v. Wade,* 388 U.S. 218, 228, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967) ("The vagaries of eyewitness identification are well-known; the annals of criminal law are rife with instances of mistaken identification."); Vitauts M. Gulbis, J.D., Annotation, *Necessity of, and prejudicial effect of omitting, cautionary instruction to jury as to reliability of, or factors to be considered in evaluating, eyewitness identification testimony—state cases,* 23 A.L.R.4th 1089 (1983). Some cases specifically discuss the cross-racial issue, in addition to the general issue of problems associated with eye-witness identifications. *See, e.g., Arizona v. Youngblood,* 488 U.S. 51, 73, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988)(Blackmun, J., dissenting)(citing to an article discussing a study, which found that

"[c]ross-racial identifications are much less likely to be accurate than same race identifications.")

We have not attempted to compile a list of all the relevant studies relating to the subject of eyewitness identification, generally, or to cross-racial identification, specifically. There is, however, an extensive list of references relating to cross-racial identification at the end of an article by Wells and Olsen, discussed in detail below. *See also* John P. Rutledge, *They All Look Alike: The Inaccuracy of Cross–Racial Identifications*, 28 AM. J.CRIM. L. 207 (2001) (discussing both studies and court opinions addressing cross-racial identification). Some courts, in the opinions cited below, discuss studies relating to the general subject of eyewitness identification, in addition to studies relating to the cross-racial issue.[3]

In this case, as discussed below, the jury was instructed with respect to the issue of eyewitness identification. The issue before us is whether a special instruction was required identifying race as a factor and, specifically, the difficulty of cross-racial identification.

Appellants contend that the trial court erred in denying their requested instruction on cross-racial identification. The requested instruction was as follows:

> In this case the identifying witness is of a different race than the defendant. In the experience of many it is more difficult to identify members of a different race than members of one's own. If this is also your experience, you may consider it in evaluating the witness's testimony. You must also consider, of course, whether there are other factors present in this case which overcome any such difficulty of identification. For example, you may conclude that the witness had sufficient contacts with members of the defendant's race that he would not have greater difficulty in making a reliable identification.

---

3. We also make it clear that there is no issue before us with respect to the admissibility of expert testimony on the question of cross-racial identification. Several courts have, however, addressed that issue. *See, e.g., State v. McClendon,* 248 Conn. 572, 730 A.2d 1107 (1999).

The proposed instruction was a quote from a concurring opinion in *United States v. Telfaire,* 469 F.2d 552, 561 (D.C.Cir.1972). The trial court in this case refused to propound the requested instruction, instead propounding Maryland Criminal Pattern Jury Instructions, MPCJI–Cr 3:30,[4] relating to the identification of a defendant. This instruction does not specifically refer to cross-racial identification as a factor to be considered in determining the reliability of the identification. The court explained that the pattern jury instructions "related to the totality of facts that were presented in this case." Appellants assert that the court's rationale in denying the requested instruction was based on the fact that the defense had not presented any evidence during trial of the problems involved with cross-racial identification.

The decision whether to give appellants' requested instruction, in addition to the general instruction on witness identification, was, as discussed below, a discretionary call. To demonstrate that discretion was appropriately exercised in this case, we shall quote extensively from the relevant testimony. On direct examination, Ms. Crandall testified, in part, as follows.

Q: What, if anything, can you tell me about the events on the night of May 8, 2002?

A: I was teaching, and en route from teaching, pulling my car into the parking area.

Q: Okay. Where was this parking area?

A: Next to my office.

Q: Okay.

---

**4.** With regard to the identification of an eyewitness, the trial court instructed the jury as follows:

You have heard evidence in this case, that prior to this trial, Ms. Crandall identified both Mr. Mack and Mr. Smith by photo array. The identification of the defendant by a single eyewitness, as the person who committed the crime, if believed beyond a reasonable doubt, can be enough evidence to convict the defendant. However, you should examine the identification of the defendant with great care.

It is for you to determine the reliability of any identification and to give it the weight that you believe it deserves.

A: On Regester street.

\* \* \*

Q: Were you walking from your car to your house?

A: I was securing the car up, or pulling the gate in, and so it's actually real close to the door of my house, so I wasn't really walking. I was securing.

Q: Who, if anyone, did you encounter when you were securing the gate?

A. Two guys walking down the street. They were coming down on the other side of the street towards me walking south.

\* \* \*

Q: Were these two people walking towards you?

A: Actually, they were walking, yes, in that direction, but I was on the west side of the street an alley, it's a narrow street, only one car, no parking on either side.

\* \* \*

A: There is that alley street so it's narrow, and they were walking on, coming south on the east side of the street, and my house was on the west side of the street, and so they were originally not coming out, they were just walking down the street. It wasn't until I said hey, guys.

Q: You spoke to them?

A: First, yes.

\* \* \*

Q: What were they wearing?

A: Normal, well, one guy was wearing gray like a baseball hat and grayish long baggie sweat shirt and long oversized pants that were down hanging towards the feet, and the other guy was wearing-

Q: Well, let me stop you there. Do you see the person who was wearing a baseball hat in the court today?

A. Yes.

Q: Could you point to him for me, please?

A: Yes, I can.

The Court: Can you describe what he's wearing now?

A: Yes, He's wearing a black, look like sweat shirt with a little green on the edge here, and I can't see his pants.

The Court: Let the record reflect that the witness has identified Mr. Smith.

Q: What was the other person wearing?

A: Dark bluish, sweat shirt and with the jeans and no hat, and a gun.

Q: Do you see him in the courtroom today?

A: Yes, I do.

Q: Tell me what he's wearing and please point to him for me?

A: Right there he's wearing a lime green shirt, white tee shirt and a jacket that has green tint to it. I would say, I would identify gray, green hue in it.

\* \* \*

The Court: Let the record reflect that the witness identified Mr. Mack. Ask your next question.

\* \* \*

Q: After you spoke to Mr. Smith and Mr. Mack, did they speak back to you?

A: No, not until they crossed the street with the gun.

Q: What happened next?

A: Well, I was, I turned to lock my pad and the key, and as I looked over my shoulder, they were now coming across the road. Mack was on the west side of the street and Smith was on the south side of the street as they approached me, and the gun was already out as they crossed the street, and it would be pretty much this coming from here maybe along the angle-

\* \* \*

It's similar to, as if they were coming kiddy corner at me. So they had to come across the street at an angle. So it wasn't making it straight down the street. They were coming toward me with the gun, and I was the only one in the alley at the time.

\* \* \*

Q: When you first saw both defendants, were you startled or taken aback that someone else was in the alley?

A: When I first saw them?

Q: Yes.

A: Startled?

Q: Yes.

A: No.

Q: Why not?

A: Because they looked normal. I wasn't—no, not at all.

Q: Their appearance was normal to you?

A: Yes. They looked great. I mean they looked fine.

Q: Had you ever seen either of them before?

A: No, never.

Q: Well, you said that Mr. Smith had a baseball cap on, it was covering his face?

A: No, no. I could see his face.

Q: Was there anything else covering Mr. Smith's face?

A: No.

Q: When you saw them, what was the lighting like in the area where you saw Mr. Smith?

A: In the area what was lighting like? It was not as bright as this. It was dark, but it was light by street lights.

Q: Were you able to make out Mr. Smith's facial features?

A: Yes.

Q: What were they, if you can recall?

A: Well, the way I described them, oval face, . . . darker skin, lean, tall, and I mean then I described his clothing, and he's pretty distinctive looking to me.

\* \* \*

Q: Did Mr. Smith touch you?

A: Yes.

Q: With what part of his body did he touch?

A: Hand.

Q: Which hand, if you recall?

A: Did he touch me with, which hand he was touching me?

Q: Yes, ma'am?

A: I don't know, both hands, I think.

Q: He touched you with both of his hands?

A: Yes, I had my key wrapped up in that hand like this wrapped around...

I had keys around, put the keys so it wasn't out, and took hold securely, and locked it into my fist and kind of held my fist really tight like you are arm wrestling with somebody. So I was holding my fist very tight like this, and he had my right hand when he strong hand.

Q: Did you ever give him permission to touch you at any time?

A: No, not at all.

Q: What, if anything, had Mr. Smith said to you before he touched you?

A: Mr. Smith didn't say anything to me.

Q: Did you say anything to him, if you recall?

A: Hi, guys. I said that when they were across the street, when I was locking my car.

The Court: Was that before or after you saw a gun, Miss Crandall?

A: Before.

Q: How close did Mr. Mack ever get to your person?

[After a demonstration, the court estimated the distance as two feet.]

Q: Was anything blocking your view of Mr. Mack's face?

A: Actually not, I tried to hold eye contact with them.

Q: Were you able to make out Mr. Mack's facial features?

A: Absolutely.

Q: Can you recall what they were?

A: I thought he was really handsome, and he had dreds. They were down, slightly trim and shorter, and full face and

nice teeth so see, talking, I mean it was pretty easy to identify him.

Q: You thought he also was a handsome young gentleman; is that fair?

A: Yes, I was actually surprised that these guys would be doing this.

* * *

Q: Did Mr. Mack say anything to you?

A: Yes.

Q: What did he say, Miss Crandall?

A: Give me your keys.

The Court: Did he use that tone that voice?

No, can you demonstrate for what his tone, the voice he used?

A: Aggressive.

Q: Demonstrate for us if you would please?

A: Give me your keys, you know, yes, he did say that, give me your keys, bitch, I'll shoot you, he was adamant about getting my keys from my hands. He wanted his friend to help him to get the keys. He was holding the gun, and I just became very, I tried to ground myself. I just got very quiet and calm, and I just kept saying, you don't want to do this. You don't want to do this.

Q: You kept saying that, is that correct?

A: That's all I kept saying. He had this intensive feeling. I was just trying to get calmer, get the situation more and more calm and just keeping everything down as I was holding my keys very, very tight, and he was grabbing them and trying to hold eye contact the entire time to make sure the gun was here, and that it was everything was going to be, you know, calm, I guess. So I kept repeating, you don't want to do this.

Q: You said you tried to remain calm. Did you remain calm?

A: Yes, I remained very calm until the next day.

* * *

Q: Now, let me ask you this, after you saw the gun, were you still able to look at these gentlemen, Mr. Mack and Mr. Smith, in their face?

A: Were I able to—after I saw—yes, absolutely, I had eye contact.

Q: You didn't just stare at the gun?

A: No, I didn't. I stared at the eyes. I wanted to see what was going on. I needed the eye contact.

Q: You said before that Mr. Mack had some kind of braids?

A: Yes, he did.

Q: Is it the same hair style as today?

A: Absolutely not, and it wasn't in the photo either.

\* \* \*

Q: The second time you met with Detective Wynn, were you able to identify any of the people who attempted to rob you on May 8, 2002?

A: Yes I was sure then.

Q: Did you identify more than one person?

A: Yes.

Q: Who is, if you recall is the first person that you identified that attempted to rob you on May 8, 2002?

A: Mr. Mack.

Q: You picked him out first?

A: Yes.

Q: Why?

A: That was the first one that was on, it was on this side of the table, so I turned it around and looked at it. That's the first one I looked at.

Q: Did you say anything to Detective Wynn when you picked out defendant Mack?

A: I said that this is him, but he look differently. He didn't look like this in the photo.

Q: What did he look like on May 8, are you saying differently from May 8?

A: Yes, different from May 8.

Q: Okay. Can you explain to me and the jury the difference?

A: Yes. He had a different hair style.

Q: When did he have a different hair style?

A: May 8, from the photo they give, and I couldn't see the height, but he looked more intense, I realized, in a sense of, and this picture is not actually becoming as he is.

Q: What do you mean by that. I don't understand that term?

A: I think he's better looking than this picture shows him.

* * *

The Court: [I]s Mr. Mack the person who held the gun on you on May 8?

A: Absolutely, absolutely.

* * *

Q: Were you able to identify anyone else from the attempted armed robbery on May 8, when you met with Detective Wynn May 23?

A: Yes, I was able to identify Mr. Smith.

* * *

Q: Now, we are here in court, does it look like the man or Mr. Smith the man who touched and tried to take your keys?

A: Absolutely.

Q: Why?

A: Well, the photo shows him, but also he's got a distinctive characteristic, that in the photo though, but when you look at him, it is even more obvious.

* * *

Q: Let me ask you, is there anything else that you could tell me as to why you are positive these are the men that tried to rob you?

A: I'm extremely good with faces.

* * *

Q: Okay.

A: Well mannerisms.

Q: I want to know why you are sure these are the men that attempted to rob you. Can you tell me why?

* * *

A: Well, I am a teacher and I watch lay mannerisms. I've been studying art and painting people since I was a little girl. I'm obsessed with people's postures and the way you looking into them and seeing what's going on. . . . And so, I think myself very, very good with people. And study faces and I have, I look for features on people that make them more distinct, Adams apple, which you have a beautiful Adams apple, very distinct and longer neck-

* * *

Q: Let me just ask the questions for the court. Starting with Mr. Mack. What specific mannerism did you identify as him being the person that tried to rob you with the gun?

A: He had a nice stature. He held it very well, and he had nice teeth actually which just telling you stuff, and he had, his mannerisms was well postured and maybe it was a gun or maybe it was the position that he was in, but there was a strong posture whereas Mr. Smith's behavior was not as aggressive, not as. . . not as strong as, have more, I guess you would say softer, even though he was still the one going for the key. There is a, I guess quieter look to him, is what I can say. And so that answer, I can go on.

* * *

Q: That is the same quieter look you see today; is that the same person?

A: Absolutely.

On cross examination, counsel for appellants questioned the witness about the amount of time she had to observe the assailants, the effect of the stress produced by the encounter, the lighting in the area, whether she was distracted by the gun, and the words that she wrote on the back of the photos of appellants.

■ With respect to jury instructions generally, Maryland Rule 4–325(c) states that, "[t]he court may, and at the request of any party shall, instruct the jury as to the applicable law and the extent to which the instructions are binding." In deciding whether the trial court was required to give the requested instruction, an appellate court, " 'must determine whether the requested instruction constitutes a correct statement of the law; whether it is applicable under the facts and the circumstances of this case; and whether it has been fairly covered in the instructions given.'" *Ellison v. State,* 104 Md.App. 655, 660, 657 A.2d 402 (1995) (quoting *Mack v. State,* 300 Md. 583, 594, 479 A.2d 1344 (1984)).

■ Even if a specific instruction is a correct statement of the law, it is required only when the facts and the circumstances call for a deviation from the pattern instruction. *Ellison,* 104 Md.App. at 660–61, 657 A.2d 402. In order for a specific jury instruction to be given, there must be some evidence presented at trial, suggesting that the instruction is warranted. *See Tripp v. State,* 36 Md.App. 459, 463, 374 A.2d 384 (1977)(finding that it is inappropriate for a judge to instruct the jury on a principle of law not suggested by the evidence in the case).

With respect to the specific question as to whether *any* jury instruction on eyewitness identification is required, *Gunning v. State,* 347 Md. 332, 701 A.2d 374 (1997), is on point and establishes that the decision is within the discretion of the trial court. *Id.* at 341, 701 A.2d 374. Before discussing the specifics of that case, however, we shall discuss *United States v. Telfaire,* 469 F.2d 552 (D.C.Cir.1972), a case relied upon by appellants and from which appellants' proposed instruction was taken.

Telfaire was charged with robbery after he was identified by a single eyewitness. For present purposes, there are two interesting points to be made about the court's opinion. The first is that the issue in *Telfaire* was whether *any* instruction should have been given specifically relating to eyewitness identification. The court held that the failure to give such an

instruction did not constitute reversible error, because the witness had an adequate opportunity to observe the perpetrator and other instructions focused attention on the issue of identification. 469 F.2d at 556. The second interesting point is that, while the court recommended that an instruction on eyewitness identification be given in future cases, and suggested a model instruction, the model instruction contained no reference to cross-racial identification. *Id.* at 558–59.

The instruction proposed by appellants in the instant case was taken from a concurring opinion by Chief Judge Bazelon, United States Court of Appeals for the Third Circuit, sitting by designation. Chief Judge Bazelon made the point, in his concurring opinion, that he thought the model instruction did not go far enough to address the problems of eye-witness identifications. 469 F.2d at 559 (Bazelon, C.J., concurring). Specifically, Chief Judge Bazelon was concerned with the problems resulting from the fact that cross-racial identifications may be more unreliable than same-race identifications. *Id.* at 560.

Circuit Judge Leventhal, in a separate opinion, responded to Chief Judge Bazelon's point. As a shorthand reference to various studies, we quote extensively from Judge Leventhal's opinion:

This is to add a thought as to useful procedure for consideration of the possibility of separate instruction on interracial identifications, discussed in Chief Bazelon's separate opinion.

In my judgment, this subject is not appropriate for inclusion in the model instruction provided with the opinion. Whether this case may involve a problem of inter-racial identification is not knowable from the record, and the point was not argued by counsel. The issue arose only because the court became concerned with the responsibility of trial judges to focus on the general issue of identification, concluding the time is ripe to fashion a model instruction that will help make this "a matter of routine" for trial judges. [FN1]

FN1. *Macklin v. United States,* 409 F.2d 174, 133 U.S
App.D.C. 139, 143 (1969).

A model instruction serves a useful function of survey and
synthesis, to distill outstanding judgments on matters that
have been pondered by this and other courts. The issue of
inter-racial identifications is not ripe for this kind of distilla-
tion of wisdom involving as it does a matter on which there
is only "meager data" and an assertion of "common sense"
views [FN2] that merit further consideration. What seems
obvious to one judge, based on his experience, may be
questioned by another, *see Quercia v. United States,* 289
U.S. 466, 53 S.Ct. 698, 77 L.Ed. 1321 (1933). When we are
dealing with an instruction to the jury on "the law," we are
or should be dealing with propositions that reflect the
wisdom of the community.

FN2. *See* Chief Judge Bazelon's dissenting opinion in *Unit-
ed States v. Brown, Proctor & Williams,* [149 U.S.App.D.C.
43, 55, 461 F.2d 134 (1972)]:

The data on this point is unfortunately meager, but it
offers at least tentative support for the widely-held, common
sense view that whites have greater difficulty identifying
blacks than identifying other whites. And it also seems
true that blacks can identify other blacks more easily than
they can identify whites.

My own reflections on the subject have been enhanced by
some surprises encountered in a little reading undertaken
after this subject arose in conference. Although some
writers say it is "a well established socio-psychological
phenomenon" that members of one race recognize each
other more readily than members of another race, [FN3] it
develops that in at least one study-which apparently sought
to confirm another point, that Negroes are more likely to
recognize white than vice versa—the data seemed to show
that Negroes recognize white faces with greater accuracy
than black faces.[FN4] If this is true, it would be necessary
to investigate the possible explanations, [FN5] and to pro-
vide the explanations and qualifications needed if a model

instruction is to avoid distortion, and possibly outright error.

FN3. P. Wall, *Eye–Witness Identification in Criminal Cases* (1965), p. 123. No empirical data are cited.

FN4. For this possibility I refer to the most recent of the studies referred to in Judge Bazelon's dissent in *Brown* [149 U.S.App.D.C. at 55, 461 F.2d 134]. *See* R.M. Malpass (of U. of Illinois) and J. Kravitz (of Howard University), *Recognition for Faces of Own and Other Race*, 13 J. OF PERSONALITY AND SOCIAL PSYCHOLOGY 330, 332 (1969).

* * *

FN5. In referring to the data that white faces are recognized more easily than black as stimuli, Malpass and Kravitz (op. cit. *supra* note 4) offer as possible hypotheses differences in distinctiveness of stimuli, calling for investigation "of the dimensionality of faces of the two races;" "that black faces are more homogeneous than white faces;" that both black and white persons "have had more exposure to white faces than black faces in public media and also will have had more contact with white persons where discriminative ability has positive motivational value."

If the instruction refers to the ultimate ingredients of the problems of identification, it might well have to note that identifiability depends on the ability (and opportunity) of the individual as perhaps influenced by such matters as his attitude toward the other race, the extent to which his ability to distinguish may have been enhanced by need or reward for such ability in past situations, and the factor whether in the individual instance the subject being identified had homogeneous characteristics (see note 5).

The wisdom of making haste slowly in discerning the generalization ready for inclusion in model instructions is underscored when what is involved is as sensitive as race relations in our society. If the subject of inter-racial identification is to be covered in instructions that are informative and objective, we may be opening the door to questioning and proffers of proof so that every time a witness makes an

identification of an offender of another race, he is subject to cross-examination on the nature and extent of his contacts with and attitudes (favorable or not) toward the other race. The more I ponder the problems, the better I understand the kernel of wisdom in the decisions that shy away from instructions on inter-racial identifications as divisive. [FN6]

FN6. *See People v. Burris*, 19 A.D.2d 557, 241 N.Y.S.2d 75, 76 (2d Dept.1963) reversing because both prosecutor and court "suggested to the jury that the identification of the defendant by the complaining witness should be weighed in the light of the fact that both the defendant and the witness were negroes." In *Burris* the court relied on *People v. Hearns*, 18 A.D.2d 922, 238 N.Y.S.2d 173, 174–175 (2d Dept.1963) where the issue was the voluntariness of defendant's confession. The prosecutor noted that the (police officer) witnesses testifying that it was voluntary were members of his own race. The court repudiated any "plea to the jury, based on color and race no matter how artfully phrased," and held the argument was improper.

> "The vice of such an argument is not only that it is predicated on a false and illogical premise, but more important it is divisive: it seeks to separate the racial origin of witnesses in the minds of the jury, and to encourage the weighing of testimony on the basis of the racial similarity or dissimilarity of witnesses."

Chief Judge Bazelon's separate opinion may well serve the useful purpose of identifying a problem that merits pondering and discussion. Perhaps this opinion, too, may be of assistance when the time comes for analysis. The more difficult question is, what is the optimum means of providing such consideration. If it is to be done solely by an appellate court, then the adversarial process-lacking in this case-would seem to be a minimum requirement. What strikes me is that this is the kind of issue which appellate judges should explore with trial judges, and with lawyers, in a manner more like that of a legislative committee, than a decision in an adversarial proceeding. There are models in this circuit in the work of committees of the Judicial Confer-

ence. There are national models in the work of committees of the American Bar Association. At least where problems require careful further exploration, these models seem to me to provide a more felicitous means of conducting such exploration-permitting common meetings on common problems between members of bench (trial as well as appellate judges), bar, and social scientists; providing time for further explorations after initial discussion; enhancing collaborative conference as distinguished from competitive or adversarial skirmish.

Mulling and interchange always take time. Yet if the problem of inter-racial identification is to be considered with discernment as well as authority, that time would be well spent.

469 F.2d at 561–63 (Leventhal, J., concurring).

In *Gunning*, 347 Md. 332, 701 A.2d 374, the Court of Appeals was presented with the same issue that was before the *Telfaire* court. *Gunning* dealt with two cases in which the trial courts refused to give a jury instruction addressing eyewitness identification. The defendants requested the instruction contained in MICPEL, Maryland Criminal Pattern Jury Instructions, MPCJI–Cr 3:30 and/or the mistaken identity instruction in David E. Aaronson, *Maryland Criminal Jury Instructions*, section 5.10.[5] *Id.* at 336, 339, 701 A.2d 374.

---

**5.** MICPEL, Maryland Criminal Pattern Jury Instructions, MPCJI–Cr 3:30, provides:

> The burden is on the State to prove beyond a reasonable doubt that the offense was committed and that the defendant was the person who committed it. You have heard evidence regarding the identification of the defendant as the person who committed the crime. In this connection, you should consider the witness'[s] opportunity to observe the criminal act and the person committing it, including the length of time the witness had to observe the person committing the crime, the witness'[s] state of mind and any other circumstance surrounding the event. You should also consider the witness' certainty or lack of certainty, the accuracy of any prior description and the witness'[s] credibility or lack of credibility, as well as any other factor surrounding the identification. [You have heard evidence that prior to this trial, a witness identified the defendant by _____.] It is for you to determine the reliability of any identification and to give it

Both trial courts refused to give either instruction, stating that the issue of identification was one of fact and should not be the subject of a jury instruction.

The Court of Appeals summarized the different approaches taken by courts that had addressed the issue. The Court observed that some courts had held that an identification instruction is mandatory if eyewitness testimony is the only evidence of the identity of the perpetrator or if the reliability of the testimony is in doubt, citing *Telfaire* as the leading case advocating that view. *Gunning*, 347 Md. at 341, 701 A.2d 374. The Court also recognized that other jurisdictions have rejected such instructions based on a conclusion that they amount to impermissible judicial comment on the evidence. *Id.* at 344, 701 A.2d 374. *See, e.g., Conley v. State*, 270 Ark. 886, 607 S.W.2d 328, 330 (1980).

---

the weight you believe it deserves. The identification of the defendant by a single eyewitness, as the person who committed the crime, if believed beyond a reasonable doubt, can be enough evidence to convict the defendant. However, you must examine the identification of the defendant with great care.

David E. Aaronson, *Maryland Criminal Jury Instructions*, § 5.10 provides:

Evidence has been introduced that ... is mistaken in identifying the defendant as the perpetrator of the crime.

Whether or not a witness has adequately identified the defendant as the perpetrator of the crime is a question solely for you to decide. In other words, the credibility of the witness is a matter for your consideration and determination. In reaching your determination, you may consider such factors as any mistake, hesitancy or inconsistency on the part of the identifying witness.

Specifically, you may consider the opportunity of the witness to view the person committing the criminal acts at the time of the crime, including: (1) how long the encounter lasted; (2) the distance between the various persons; (3) the lighting conditions at the time; (4) the witness'[s] state of mind at the time of the offense; and (5) the witness'[s] degree of attention to the offender during the commission of the offense. Also, you may consider the accuracy of the witness'[s] prior description of the criminal, if any; the certainty or lack of certainty expressed by the witness; the demeanor and conduct of the witness making the identification; and any other direct or circumstantial evidence which may identify the person who committed the offense charged or which corroborates—that is, strengthens--or negates the identification of the defendant by the witness.

After considering the various approaches, the Court of Appeals held that an instruction on identification was neither mandatory nor necessarily improper, and the decision whether to give such an instruction rested in the discretion of the trial court. *Gunning*, 347 Md. at 348, 701 A.2d 374. In making its decision, the trial court should consider whether the eyewitness testimony is a critical element of the State's case, doubts about its reliability, any corroborating evidence, and guidance given in other instructions. *Id.* at 354, 701 A.2d 374. Because the trial court, in the case before it, did not exercise discretion, the Court reversed and remanded for a new trial. *Id.* at 355, 701 A.2d 374.

Under the holding of *Gunning*, that the giving of an eyewitness identification instruction lies within the discretion of the trial court, it necessarily follows that the giving of the instruction at issue in this case lies within the trial court's discretion. In the case before us, the circuit court exercised its discretion and gave an instruction concerning eyewitness identification. It also exercised its discretion and determined that appellants' requested instruction was not warranted by the evidence.

Nevertheless, in support of their proposition that the requested instruction should have been propounded, appellants cite the New Jersey Supreme Court's decision in *State v. Cromedy*, 158 N.J. 112, 727 A.2d 457 (1999), which held that a cross-racial instruction should have been given, even though the defendant did not present any "scientific" evidence at trial that such identification was problematic. The New Jersey court concluded that a cross-racial identification instruction should be given, "when, as in the present case, identification is a crucial issue in the case, and an eyewitness's cross-racial identification is not corroborated by other evidence giving it independent reliability." *Id.* at 467.

The short answer to appellants' argument is that *Cromedy* is based on New Jersey law, which is inconsistent with Maryland law. Under New Jersey law, an eyewitness identification instruction is required when eyewitness identification is a critical issue in the case. *Cromedy*, 727 A.2d at 465 ("It is

well established in this State that when identification is a critical issue in the case, the trial court is obligated to give the jury a discrete and specific instruction that provides appropriate guidelines to focus the jury's attention on how to analyze and consider the trustworthiness of eyewitness identification."). As we have seen, that is not Maryland law. *Gunning,* 347 Md. at 345, 701 A.2d 374 ("We concur with those courts that have declined to adopt either of the rigid rules on the appropriateness of an identification instruction, and have instead held that the decision as to whether to give such an instruction lies within the sound discretion of the trial court."). Under *Gunning,* even when identification is a critical issue in a case and there is no corroborating evidence, an identification instruction is not necessarily required, and the test is abuse of discretion. *Id.* at 355, 701 A.2d 374.

We shall discuss *Cromedy* at greater length, however. First, on the facts of *Cromedy,* had it been decided under an abuse of discretion standard, the trial court would have been within its discretion in giving a cross-racial identification instruction. In *Cromedy,* a white victim was raped and robbed by someone who she described as an African–American male "in his late 20's to early 30's, full-faced, about five feet five inches tall, with a medium build, mustache, and unkempt hair." 727 A.2d at 459. The victim did not identify the defendant until eight months after the attack. At the time, the victim was standing on a street corner, and she spotted the defendant across the street. She notified the police, and the man was arrested. The victim had failed to identify her attacker in a photo array which had been shown to her shortly after the attack, even though it contained a picture of the defendant. *Id.* There was no forensic evidence. *Id.*

Second, we shall discuss the rationale of the *Cromedy* court because it is instructive. The Supreme Court of New Jersey summarized the results of empirical studies with respect to cross-racial identification as follows.

For more than forty years, empirical studies concerning the psychological factors affecting eyewitness cross-racial or cross-ethnic identifications have appeared with increasing

frequency in professional literature of the behavioral and social sciences. *People v. McDonald*, 37 Cal.3d 351, 208 Cal.Rptr. 236, 690 P.2d 709, 717–18 (1984). One study finds that jurors tend to place great weight on eyewitness identifications, often ignoring other exculpatory evidence. *See* R.C.L. Lindsay et al., *Can People Detect Eyewitness–Identification Accuracy Within and Across Situations?*, 66 J. APPLIED PSYCHOL. 79, 79–89 (1981)(finding that jurors believe eyewitnesses despite poor witnessing conditions). Others have concluded that eyewitnesses are superior at identifying persons of their own race and have difficulty identifying members of another race. *See generally* Gary L. Wells & Elizabeth F. Loftus, *Eyewitness Testimony: Psychological Perspectives* 1 (1984); Elizabeth F. Loftus, *Eyewitness Testimony* (1979). *See also* Sheri Lynn Johnson, *Cross–Racial Identification Errors in Criminal Cases*, 69 CORNELL L.REV. 934 (1984); Stephanie J. Platz & Harmon M. Hosch, *Cross–Racial/Ethnic Eyewitness Identification: A Field Study*, 18 J. APPLIED SOC. PSYCHOL. 972 (1988). *But see* R.C.L. Lindsay & Gary L. Wells, *What Do We Really Know About Cross–Race Eyewitness Identification?*, in *Evaluating Witness Evidence: Recent Psychological Research and New Perspectives* 219 (Sally M.A. Lloyd–Bostock & Brian R. Clifford eds., 1983)(failing to find cross-racial impairment). This phenomenon has been dubbed the "own-race" effect or "own-race" bias. Its corollary is that eyewitnesses experience a "cross-racial impairment" when identifying members of another race. Studies have consistently shown that the "own-race effect" is "strongest when white witnesses attempt to recognize black subjects." *McDonald*, *supra*, 208 Cal.Rptr. 236, 690 P.2d at 720.

Although researchers generally agree that some eyewitnesses exhibit an own-race bias, they disagree about the degree to which own-race bias affects identification. In one study, African–American and white "customers" browsed in a convenience store for a few minutes and then went to the register to pay. Researchers asked the convenience store clerks to identify the "customers" from a photo array. The

white clerks were able to identify 53.2% of the white customers but only 40.4% of the African–American subjects. Platz & Hosch, *supra*, 18 J. APPLIED SOC. PSYCHOL. at 977–78. The overall accuracy rate for all participants was only 44.2%. *Id.* at 981. Similar studies have found that own-race bias exists to a lesser degree. *See* John C. Brigham et al., *Accuracy of Eyewitness Identifications in a Field Setting*, 42 J. PERSONALITY & SOC. PSYCHOL. 673, 681 (1982) (finding white clerks misidentified white "customers" 45% of the time and African–American "customers" 50% of the time). *But see* Roy S. Malpass & Jerome Kravitz, *Recognition for Faces of Own and Other Race*, 13 J. PERSONALITY & SOC. PSYCHOL. 330, 330–34 (1969)(finding white subjects misidentified black faces two to three times more often than they misidentified white ones). A snap-shot of the literature reveals that although many scientists agree that witnesses are better at identifying suspects of their own race, they cannot agree on the extent to which cross-racial impairment affects identification. *See* McDonald, *supra*, 208 Cal.Rptr. 236, 690 P.2d at 720; *see also United States v. Nguyen*, 793 F.Supp. 497, 513–14 (D.N.J.1992)(rejecting testimony on cross-racial identification where expert's proffer could not quantify degree to which it is "more difficult" to make accurate cross-racial identifications).

The research also indicates disagreement about whether cross-racial impairment affects all racial groups. Four studies have found that African–American eyewitnesses do not experience cross-racial impairment at all. Johnson, *supra*, 69 CORNELL L.REV. at 939 (citing studies finding African–American eyewitnesses identified both white and black subjects with same degree of accuracy). Other studies have concluded that white eyewitnesses experience cross-racial impairment more often than African–American eyewitnesses. *Ibid.* (citing five studies concluding black subjects experience some degree of cross-racial impairment); *cf.* John C. Brigham, *The Influence of Race on Face Recognition*, in *Aspects of Face Processing* 170–77 (Hadyn D. Ellis et al. eds., 1986)(finding cross-race effects

were comparable for both races). One study has found that African Americans make better eyewitnesses in general. Platz & Hosch, *supra*, 18 J. APPLIED SOC. PSYCHOL. at 978 (finding, overall, eyewitnesses made correct identifications only 44.2% of the time, but that the African–American clerks correctly identified 54.6% of the white "customers" and 63.6% of the black "customers").

Many studies on cross-racial impairment involve subjects observing photographs for a few seconds. Because the subjects remembered the white faces more often than they recalled the African–American faces, researchers concluded that they were biased towards their own race. *See* Paul Barkowitz & John C. Brigham, *Recognition of Faces: Own–Race Bias, Incentive, and Time Delay*, 12 J. APPLIED SOC. PSYCHOL. 255 (1982). Yet, there is disagreement over whether the results of some of the tests can be generalized to real-world situations in which a victim or witness confronts an assailant face-to-face and experiences the full range of emotions that accompany such a traumatic event.

Continuing its analysis, the *Cromedy* court acknowledged that a majority of courts have held that giving a cross-racial identification instruction is discretionary. It continued:

Courts typically have refused the instruction where the eyewitness or victim had an adequate opportunity to observe the defendant, there was corroborating evidence bolstering the identification, and/or there was no evidence that race affected the identification. *See* [*Commonwealth v. Hyatt*, 419 Mass. 815, 647 N.E.2d 1168, 1171 (1995) ](declining instruction in rape and robbery case where victim was terrorized for fifteen to twenty minutes in broad daylight and could see the attacker's face); *see also Commonwealth v. Engram*, 43 Mass.App.Ct. 804, 686 N.E.2d 1080 (1997)(declining instruction where numerous eyewitnesses saw defendant at close range and positively identified him from a line-up and photo array).

A number of courts have concluded that cross-racial identification simply is not an appropriate topic for jury instruction. *See State v. Willis*, 240 Kan. 580, 731 P.2d 287,

292–93 (1987); *Hyatt, supra,* 647 N.E.2d at 1171; *People v. McDaniel,* 217 A.D.2d 859, 630 N.Y.S.2d 112, *appeal denied,* 87 N.Y.2d 848, 638 N.Y.S.2d 607, 661 N.E.2d 1389 (1995). Those courts have determined that the cross-racial instruction requires expert guidance, and that cross-examination and summation are adequate safeguards to highlight unreliable identifications.

Other jurisdictions have denied the instruction, finding that the results of empirical studies on cross-racial identification are questionable. *See Telfaire, supra,* 469 F.2d at 561–62 (Leventhal, J., concurring) (rejecting cross-racial instruction because data supporting hypothesis is "meager"); *People v. Bias,* 131 Ill.App.3d 98, 86 Ill.Dec. 256, 475 N.E.2d 253, 257 (1985)(rejecting instruction in robbery case where eyewitness failed to describe key distinguishing facial features and gave inconsistent descriptions because empirical studies are not unanimous). One jurisdiction has even rejected cross-racial identification instructions as improper commentary on "the nature and quality" of the evidence. *See State v. Hadrick,* 523 A.2d 441, 444 (R.I.1987)(rejecting such instruction in robbery case where victim viewed perpetrator for two to three minutes at close range during robbery and identified him from a line-up).

727 A.2d at 464–465. *See also Howell v. State,* 860 So.2d 704, 748–749 (Miss.2003)(discussing cases approving and disapproving of cross-racial identification jury instructions).

Before leaving *Cromedy,* it is interesting to note that, sometime prior to 1992, the New Jersey Supreme Court had appointed a Task Force on Minority Concerns, which produced a report in 1992. *See New Jersey Supreme Court Task Force on Minority Concerns Final Report,* 131 N.J.L.J. 1145 (1992). The task force debated the need for a cross-racial and cross-ethnic identification instruction for more than five years. *Cromedy,* 727 A.2d at 465. The task force, in 1992, recommended that the Supreme Court develop a special jury instruction relating to cross-racial identifications. *Id.* The Supreme Court, thereafter, referred the recommendation to the "Criminal Practice Committee." That committee recom-

mended against such an instruction, because the admissibility of evidence to support the instruction had not been decided. Subsequently, the "Committee on Minority Concerns" submitted a proposed instruction to the "Model Criminal Jury Charge Committee." That committee withheld action pending the court's decision in *Cromedy*. Our point in relating this information is that the New Jersey Supreme Court rendered its decision only after following a set procedure for addressing jury instructions and after years of study.

The question of identifying specific factors in an eyewitness identification instruction is too complex to simply mandate that race should be identified as a factor. In this State, the Court of Appeals has already ruled that the giving of a general eyewitness identification instruction is discretionary, and by necessary implication, the same is true with respect to an instruction that identifies specific factors, such as race.

All studies of eyewitness identification are general, and the results may or may not have any relevancy in a given case. Consequently, in a given case, whether an instruction should be given and what it should address has to be determined by the evidence in that case. When and what evidence is required? Should an eyewitness identification instruction always include a laundry list of specific factors based on the perceived common knowledge of men and women? When does such an instruction constitute an improper comment on the evidence by the court? More to the point here, if race is to be identified as a factor, should the same be true for ethnicity and other analogous factors? What is the rule for multi-racial persons? How does one determine race? Is race self-proclaimed? What is the rule for persons who marry persons of another race?

With respect to more current literature on the subject of cross-racial identification, we note an article by Gary L. Wells and Elizabeth A. Olsen, *The Other Race–Effect in Eyewitness Identification*, 7 PSYCHOL. PUB. POL'Y & L. 230 (2001). The authors, particularly Mr. Wells, have studied and written on the subject for many years, and they conclude that the other

race effect fluctuates based on a number of variables. These variables include: (1) the extent of an eyewitness's experience with the faces of another race, *e.g.*, C.A. Meissner, C.A. & J.C. Brigham, *Thirty Years of Investigating the Own–Race Bias in Memory for Faces: A Meta–Analytic Review*, in PSYCH, PUB. POL & L. 3–35 (2001); (2) the distinctiveness of the face, *e.g.*, G. Chiroro & T. Valentine, *An Investigation of the Contact Hypothesis of the Own–Race Bias in Face Recognition*, in QUARTERLY JOURNAL OF EXPERIMENTAL PSYCHOLOGY 48, 879–894 (1995); and (3) the time lapse between the incident and the identification, *e.g.*, M. Fallshore & J.W. Schooler, *Verbal Vulnerability of Perceptual Expertise*, in JOURNAL OF EXPERIMENTAL PSYCHOLOGY 21, 1608, 1623 (1995). The authors conclude that the operative factor in identification is physiognomic characteristics, regardless of racial classification, citing a study indicating that "White Americans" have more difficulty identifying "Mexican Americans" than other "White Americans." S.J. Platz & H.M. Hosch, *Cross Racial/Ethnic Eyewitness Identification: A Field Study*, in JOURNAL OF APPLIED SOCIAL PSYCHOLOGY 18, 972, 984 (1988).

Mr. Wells and Ms. Olsen, while not opposed to expert testimony at trial, do not recommend its use or the use of special jury instructions relating to cross-racial identification. They do recommend increasing the number of known innocent persons as "fillers" in pretrial identification procedures.[6]

As explained herein, the court did not abuse its discretion in this case. Assuming that, in a given case, it may be appropriate for a trial court to mention specific factors, including cross-racial identification, it would be helpful if the Court of Appeals provided guidance as to when and under what circumstances. The Court could utilize the Rules Committee and other com-

---

6. In the case before us, no issue has been raised with respect to the pretrial identification procedures. Additionally, we note that Ms. Crandall did not identify anyone in the original array, thus minimizing the danger expressed by Mr. Wells and Ms. Olsen, *i.e.*, a given witness might misidentify someone because of lack of discernment or perhaps other reasons.

mittees, including the process for producing pattern jury instructions, if it sees fit to do so.

In the present case, Ms. Crandall identified the defendants within two weeks of her attack, and when the detective showed her the first photo array, she was certain that photos of the perpetrators were not included. Ms. Crandall identified the change in Mr. Mack's hairstyle between his photo and their confrontation. Ms. Crandall articulated specific features and was consistent in her identification. There was no evidence that Ms. Crandall lacked familiarity and contact with persons of appellants' race, from which one might infer possible difficulty in identification.[7] There was nothing to suggest that race played a part in the identification.

Because there was no evidence of any problem associated with cross-racial identification, the pattern instruction given, which advised the jury to, "examine the identification of the defendant with great care," was sufficient. *See Fleming v. State*, 373 Md. 426, 432, 818 A.2d 1117 (2003)(explaining that when a requested instruction has not been generated by the evidence, the trial court is not required to give such an instruction).

As the appellants presented no evidence during trial to warrant the specific instruction, and the pattern instruction given was appropriate and sufficient under the facts and circumstances of this case, the court did not abuse its discretion.

### Closing Argument

In the case before us, the court ruled that counsel could not argue "cross racial identification[,]" because there was "no evidence in this case to that effect[,]" but could argue the fact

---

7. Data from the 2000 United States Census indicates that Baltimore City is 64.3% African American and 31.6% White. Maryland Quick Facts from the United States Census Bureau, *available at http://quick-facts.census.gov/qfd/states/24/24510.html*. Thus, it is clear that an individual who resides in the City, especially in a neighborhood as diverse as Fells Point, will frequently come into contact with members of another race.

that Ms. Crandall is white and appellants are black. Appellants argue that the court erred in barring defense counsel from arguing about the difficulty of a cross-racial identification.

■■ "The [trial] court, in a criminal trial, has wide discretion in determining what is allowed during closing arguments and we will not reverse the circuit court absent a clear showing of abuse of discretion and prejudice to the accused." *Wilson v. State*, 148 Md.App. 601, 653, 814 A.2d 1 (2002). *See also Booze v. State*, 111 Md.App. 208, 223–24, 681 A.2d 534 (1996)("The trial judge has wide discretion with respect to what counsel may say during closing argument and the trial judge's exercise of that discretion will not be disturbed unless clearly abused and prejudicial to the defendant.") (citations omitted). Moreover, in closing argument, counsel may only discuss evidence that was presented at trial and all reasonable inferences that may be drawn from those facts in evidence. *Henry v. State*, 324 Md. 204, 231, 596 A.2d 1024 (1991).

The question whether the court erred in restricting closing argument is separate from the jury instruction question. In other words, even though a cross-racial identification instruction is not required, comments on cross-racial identification may be permissible. *See, e.g., State v. Wiggins*, 74 Conn.App. 703, 813 A.2d 1056 (2003)("Although cross-racial identification jury instructions may not be required, cross-examination and closing argument may be employed to demonstrate the problems that might arise as a result of cross-racial identification.").

Appellants assert that they should be granted the same latitude as the State, and therefore be allowed to refer, in closing argument, to matters of "common knowledge" that relate to facts in evidence. *White v. State*, 125 Md.App. 684, 703, 726 A.2d 858 (1999).

They were. The trial court observed that appellants could point out in argument that the victim was "white" and the defendants were "black." Appellants were also free to argue that Ms. Crandall was mistaken in her identification of appel-

lants. They in fact did so, emphasizing (1) the limited period of time Ms. Crandall had to view the assailants, (2) the fact that Ms. Crandall did not know the assailants, (3) the lighting in the area, (4) Ms. Crandall's stress level during the encounter, (5) the lapse of time between the incident and the identification, (6) the obstruction of faces by clothing, (7) the existence of another suspect identified by the police, whose photo was included in the photo array, and (8) the relative skin complexions and hair styles of the persons shown in the photos.[8]

With respect to the last factor, Mr. Smith's counsel argued that his client was "the darkest complected individual in this array" and had "a receding hairline." Counsel suggested that the combination made the photograph of Mr. Smith stick out "like a sore thumb." Similarly, Mr. Mack's counsel argued that his client's photo was "distinctively darker than the other people, only five people in the photo array. And that's another factor to consider, his photo and all because of his dark complexion more so than the other people in that photo array."[9] It is not clear what else appellants would have argued in the absence of the court's ruling, and there was no proffer in that regard.

▆ As the *Cromedy* court recognized, "care must be taken to insulate criminal trials from base appeals to racial prejudice." 727 A.2d at 467. In the case before us, appellants argued all the factors that were supported by the evidence and that were relevant to the reliability of the eyewitness's testimony. We have set forth Ms. Crandall's testimony at length

---

8. All of the photos shown to Ms. Crandall were admitted into evidence.

9. Detective Wynn testified that printed at the top of all photo arrays is the following explanation:

> This group of photographs may or may not contain the picture of the person that committed the crime now being investigated. Keep in mind that hair styles, beards and mustaches may be easily changed. Also photographs may not always depict the true complexion. It may be darker or lighter. When you look at all the photos, tell me if you can identify anyone. Don't tell other witnesses that you have or have not identified anyone.

to demonstrate that her identification of appellants was not race-based. First, Ms. Crandall lived in the Fells Point neighborhood of Baltimore City. Common knowledge of that area, consistent with some of the observations in her testimony, make it clear that she had considerable exposure to persons of other races, thus enabling her to discern differences in features.[10] Second, Ms. Crandall's testimony was based on specifics, not a general description of race and build. The question of her credibility as to the specifics and the more general question as to whether she was inaccurate were questions for the jury. *See, e.g., Riggins v. State,* 155 Md. App. 181, 206, 843 A.2d 115 (2004)("In a criminal case tried before a jury, a fundamental principle is that the credibility of a witness and the weight to be accorded the witness' testimony are solely within the province of the jury ....")(quoting *Bohnert v. State,* 312 Md. 266, 277–78, 539 A.2d 657 (1988)).

There is no evidence that Ms. Crandall was socially prejudiced.[11] The trial court must be free to conduct the trial so as to minimize the potential for social prejudice to be a factor in a trial. In the context of this case, in deciding how far counsel could go in expressly arguing race, the court had to strike a balance between permitting comment on legitimate factors relevant to identification versus a subtle or not so subtle appeal to social prejudice. The trial judge must have wide discretion in order to strike such a balance.

Studies indicate that cross-racial or cross-ethnic considerations may be a legitimate factor in certain instances, not related to social prejudice, but the degree to which argument should be permitted on the difficulty of cross-racial or cross-ethnic identification will depend on the facts of each case. On a case by case basis, the court must determine whether there is a pertinent justification for a comment on race. For

---

**10.** See footnote 7 quoting 2000 Census data and describing the diversity in Baltimore City generally, and Fells Point specifically.

**11.** We use the term "social prejudice" to differentiate it from the ability to discern features, independent of how one feels about members of another race.

example, it may be proper to allow counsel to argue about the issues related to cross-racial identification when the facts of that particular case indicate: (1) a demonstrable equivocal identification; (2) a recanted identification; (3) a witness with no exposure to members of the subject race; and/or (4) virtually little or no time to observe the offender, or some combination thereof. When these or other relevant circumstances are present, upon request by counsel, the court may properly allow counsel to provide the evidentiary basis, *i.e.* experts and/or studies, on which counsel plans to base the argument to the jury about cross-racial identification. Thus, so long as there is evidence presented whereby one may, at the very least, draw a reasonable inference that cross-racial identification was an issue, counsel should be granted latitude to present such an argument.

These factors, quite simply, were not present in the instant case, however. In this case, the race of the participants was obvious to the jury. The jury could apply its common knowledge and experience. With respect to identification factors arguably related to race, appellants' counsel argued the "complexion" of appellants, implying that Ms. Crandall picked the person with the darkest complexion from each of the later two arrays. Ms. Crandall based her identification on other factors and obviously the jury found her credible. The point here, though, is that we cannot conclude that the court abused its discretion.

**JUDGMENTS AFFIRMED. COSTS TO BE PAID BY APPELLANTS.**

DAVIS, J., concurring.

Although I concur with the majority opinion that the lower court did not err in denying the request of counsel to argue cross-racial identification to the jury, I write separately to express my profound concern that, in a proper case, counsel should be allowed latitude by the trial judge with respect to argument concerning matters legitimately a part of a judicial proceeding. At the outset, I agree wholeheartedly with the

dissenting opinion of my colleague who points out that "appellant clearly had the right to attack the credibility of this witness, and to do so by arguments directed at proving a weakness in her capacity to perceive or remember the facial characteristics of her attacker." I further recognize that, as the dissent points out, the eyewitness identification by the victim of the appellant was not only the "critical evidence," it was the *only* evidence which was contested at trial.

Significantly I further acknowledge that "there is a substantial body of empirical study suggesting that cross racial identification, particularly by whites of blacks, is more difficult than identification of a person within one's own race." I view cross-racial identification as a subset of the more universal problem of the unreliability of eyewitness identification, generally. Historically, as a precursor to addressing the problem of cross-racial identification, many studies have shown that eyewitness identification is often unreliable, particularly when the opportunity to observe is short and the critical moment is stressful. The factors which contribute to the unreliability of eyewitness identification, generally, are merely exacerbate when the witness is called upon to distinguish features unfamiliar to him or her. Thirty seven years ago, the Supreme Court attempted to address factors known to result in misidentification of criminal defendants.[12]

Counsel should be allowed, in my judgment, with proper safeguards, to argue to a jury, that it may consider the greater difficulty of recalling the features and identifying characteristics of a member of a group with whom one has had

---

**12.** Recognizing the vagaries of eyewitness identification, the Supreme Court, set forth elaborate procedures in the *Wade* (*United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149), *Gilbert* (*Gilbert v. State of California,* 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178), *Stovall* (*Stovall v. Denno,* 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199) trilogy (decided on June 12, 1967) to ensure that judicial identifications upon which convictions are obtained are not the result of observations made at any time other than during the criminal event or that such identifications are not "impermissibly suggestive" because of improper police conduct. These procedures, however, address external influences rather than questions of perception and memory of the witness.

little or no contact as opposed to a member of one's own ethnic or racial group.

That said, I part company with my dissenting colleague in equating an argument regarding cross-racial identification based on "the common sense view that whites have greater difficulty identifying blacks" with the principle, well-established in Maryland, that counsel may draw reasonable inferences from evidence before the court or jury. As the dissenting opinion notes, appellant made a motion *in limine,* requesting the court to approve a jury instruction on cross-racial identification in contemplation of raising the issue in his opening statement. It was incumbent upon counsel, at that juncture or during the trial, to proffer an evidentiary basis for the theory he wished to argue to the jury.

Cross examination remains the most effective means of challenging the accuracy of the witness' in-court identification. In the instant case, as the majority points out, appellant was allowed to argue that which had been explored on cross-examination, *e.g.,* lack of prior knowledge of assailants, conditions bearing on opportunity to observe and the complexions and hair styles of the persons shown in photo array *vis-a-vis* those of appellant. It should be noted that the trial judge permitted appellant to point out during closing argument to the jury the racial difference between the victim and the appellant. What was left unsaid was that in the experience of some (or many), it is more difficult to identify members of a different race than members of one's own. I do not believe it would have been improper had the trial judge allowed counsel to make that comment. In the absence of circumstances indicating the victim in this case lacked familiarity with African Americans or that there were other race-based circumstances bearing on her ability to identify appellant, the trial judge, in my judgment, did not abuse her discretion.

In many of the court decisions [13] which consider cross-racial identification, empirical data has been introduced into evi-

---

13. See *e.g., State v. Cromedy, supra.*

dence, providing a sound common basis for each of the jurors to apply the principle. The majority discusses the certitude of the testimony of Christine Randall, the victim, who stated she was "good with faces" attributing that quality to her background in art and "painting people." Although I believe that it is preferable that the jury be aided in what to consider when judging the accuracy of cross-racial identification, *i.e.* the results of empirical studies or research, at the very least, there should be some evidentiary basis to believe a witness' identification may be impaired because of unfamiliarity with members of another race or ethnic background. The witness' testimony, in my judgment, could properly provide that evidentiary basis. In the case, *sub judice,* however, I discern no indication in the testimony of the victim that the fact that appellant was of a difference race impaired her ability to identify him.

ADKINS, J., dissenting.

I join in Judge Eyler's well written majority opinion only in part. I agree that the trial court did not abuse its discretion in declining to instruct the jury on the difficulties of cross-racial identification for the reasons stated by Judge Eyler.

I respectfully dissent, however, from the majority's conclusion that the trial court acted within its discretion in refusing to allow appellant to argue in his summation that they should consider the difficulty of cross-racial identification in assessing the credibility of an eyewitness. I differ from the majority on this second issue because of the fundamental nature of closing argument—"a robust forensic forum wherein its practitioners are afforded a wide range of expression." *Williams v. State,* 137 Md.App. 444, 455, 768 A.2d 761, *cert. denied,* 365 Md. 268, 778 A.2d 383 (2001) (citations omitted). *See also State v. Wiggins,* 74 Conn.App. 703, 813 A.2d 1056, 1059 (2003)("Although cross-racial identification jury instructions may not be required, cross-examination and closing argument may be employed to demonstrate the problems that might arise as a result of cross-racial identification").

### The Record Below

Before further discussion of the law, I pause to review the pertinent legal proceedings leading up to closing argument. Before trial, appellants requested the court to approve a jury instruction on cross-racial identification. They did so *in limine* so that they could raise the issue in opening statements. The trial court, after hearing arguments, denied appellants' motion.

THE COURT: With regard to Mr. Owen's [counsel for Smith] motion, I am going to reserve until ... we discuss jury instructions, which means, Mr. Owens, you'll not be able to argue it in opening.

MR. FISCHER [counsel for Mack]: I can't mention that that's one possible factor?

THE COURT: You cannot. You can say my client's black if you want to. You can't say a single—you can't argue the law anyway, only argue facts in opening. You can certainly point out this case is based on a single eyewitness identification.

After the trial court denied the requested jury instruction, defense counsel requested that they be allowed to raise the cross-racial identification issue during closing arguments. The following colloquy occurred:

MR. FISCHER: Your Honor, I understand you will not be reading an instruction to the jury on cross-racial identification. None the less, will the defense counsel be permitted to argue to the jury on cross-racial identification.

THE COURT: The defense counsel will not be able to argue cross-racial identification, ... there is no evidence in this case to that effect. But defense certainly could say my client is black, victim is white.

MR. FISCHER: **But we are free to argue one reasonable inference, identification would not be as strong as if the complainant and defendant were the same race?**

THE COURT: You can argue th[e] facts that are in evidence. That is not a fact that is in evidence.

MR. FISCHER: **But it's an inference that can be drawn.**

THE COURT: You can argue he is black, and the victim is white. Anything else?

MR. ROE: No, Your Honor.

MR. OWENS: No, Your Honor.

MR. FISCHER: No, Your Honor. (Emphasis added).

Before closing arguments, defense counsel renewed his request to argue cross-racial identification in his closing. The trial court again denied the motion.

THE COURT: Okay. So it is perfectly clear, I'm denying your request, but I would permit [you] to say that your client is black, victim is white, but I will not let you refer to cross-racial identification.

MR. FISCHER: And I take exception.

THE COURT: Certainly.

During closing arguments neither defense counsel raised cross-racial identification, nor did they mention the respective races of appellants or the victim.

### Law Of Closing Argument

"Subject to the trial court's discretion, both the State's Attorney and defense counsel are given wide latitude in the conduct of closing argument, including the right to explain or to attack all the evidence in the case." *Trimble v. State,* 300 Md. 387, 405, 478 A.2d 1143 (1984), *cert. denied,* 469 U.S. 1230, 105 S.Ct. 1231, 84 L.Ed.2d 368 (1985) (citations omitted). In the seminal case of *Wilhelm v. State,* 272 Md. 404, 326 A.2d 707 (1974), the Court of Appeals discussed the content and boundaries of legitimate closing argument.

As to summation, it is, as a general rule, within the range of legitimate argument for counsel to state and discuss the evidence and **all reasonable and legitimate inferences** which may be drawn from the facts in evidence; and such comment or argument is afforded a wide range. Counsel is free to use the testimony most favorable to his side of the

argument to the jury, and the evidence may be examined, collated, sifted and treated in his own way. . . . Generally, counsel has the right to make any comment or argument that is warranted by the evidence proved or inferences therefrom. . . .

While arguments of counsel are required to be confined to the issues in the cases on trial, the evidence and fair and reasonable deductions therefrom, and to arguments of opposing counsel, generally speaking, liberal freedom of speech should be allowed. There are no hard-and-fast limitations within which the argument of earnest counsel must be confined—no well-defined bounds beyond which the eloquence of an advocate shall not soar. [Counsel] may discuss the facts proved or admitted in the pleadings, assess the conduct of the parties, and **attack the credibility of witnesses.** [Counsel] may indulge in oratorical conceit or flourish and in illustrations and metaphorical allusions.

As a limitation upon the general scope of permissible closing argument this Court . . . cautioned that counsel should not be permitted by the court, over proper objection, to state and comment upon facts not in evidence or to state what he [or she] could have proven.

*Id.* at 412–13, 326 A.2d 707 (emphasis added, citations omitted).

"[I]t is well settled in Maryland that, during closing argument, the [lawyer] may draw reasonable inferences from the evidence before the court and/or the jury." *Daniel v. State,* 132 Md.App. 576, 594, 753 A.2d 545, *cert. denied,* 361 Md. 232, 760 A.2d 1106 (2000). Although a lawyer cannot falsely represent facts in evidence, counsel may even be illogical about the inferences he or she asks the jury to make.

Counsel is free to use the testimony most favorable to his side of the argument to the jury, and the evidence may be examined, collated, sifted and treated in his own way. Moreover, if counsel does not make any statement of fact not fairly deducible from the evidence **his argument is not**

**improper, although the inferences discussed are illogical and erroneous.**

*Id.* (emphasis added, citations omitted). "The evil to be avoided is the appeal that diverts the jury away from its duty to decide the case on the evidence." *White v. State,* 125 Md.App. 684, 704, 726 A.2d 858, *cert. denied,* 354 Md. 573, 731 A.2d 971 (1999).

The critical evidence adduced by the State in this case is the eyewitness identification of the appellants by the victim. Appellants clearly had the right to attack the credibility of this witness, and to do so by arguments directed at proving a weakness in her capacity to perceive or remember the facial characteristics of her attacker. *Cf.* Md. Rule 5–616(a)(5)(the credibility of a witness may be attacked through questions directed at proving that the witness has "weaknesses in [his or her] capacity . . . to perceive [or] remember").

As the majority recognizes, moreover, there is a substantial body of empirical study suggesting that cross-racial identification, particularly by whites of blacks, is more difficult than identification of a person within one's own race. As the majority notes, there has also been judicial recognition of this phenomenon. *See, e.g.,* Chief Judge Bazelon's dissenting opinion in *United States v. Brown,* 461 F.2d 134, 145 n. 1 (C.A.D.C.1971)(referring to the "widely-held, common sense view that whites have greater difficulty identifying blacks than identifying other whites"); *State v. Cromedy,* 158 N.J. 112, 727 A.2d 457, 461 (1999)("For more than forty years, empirical studies concerning the psychological factors affecting eyewitness cross-racial or cross-ethnic identifications have appeared with increasing frequency in professional literature of the behavioral and social sciences").

This difficulty in cross-racial identification may arise because the color of the stranger's skin may be the most obvious information to observe and absorb, and therefore consume a disproportionate amount of the observer's attention and memory. Alternatively, patterns and stereotypes existing in the

observer's mind may interfere. As the Sixth Circuit explained:

> Many investigators believe that perception and memory are not purely deductive, but have substantial inductive components. *See, e.g.,* Buckhout, "Eyewitness Testimony," 231 Scientific American 23 (Dec.1974). Witnesses focus on gross or salient characteristics of any sensory experience, and fill in the details, not according to the observed facts of the experience, but according to some previously internalized pattern they associate with the perceived gross characteristics. In addition, the construction of memory is greatly · influenced by post-experience suggestion. Suggestions compatible with the witness' internalized stereotype are likely to become part of the witness' memory, not because they are in fact similar to the actual experience, but because they fit the preconceived stereotype.

*United States v. Russell,* 532 F.2d 1063, 1066 (6th Cir.1976).

In my view, a person may acquire appreciation of this difficulty in perception simply through his or her own experience, *i.e.,* by observing his or her own personal difficulty in making cross-racial identifications of strangers, particularly when the perception time is short. Or, the awareness may be acquired through years of social interaction with others who experience the difficulty. Although cross-racial identification difficulty may be directly experienced by only a portion of the population, the experience, and general awareness of it is sufficiently widespread to call it a matter of common knowledge. As such, it is appropriate to include in closing argument. *See Wilhelm,* 272 Md. at 445, 326 A.2d 707 (jury argument could include mention of "[r]easonable and legitimate inferences ... from the facts which were of such general notoriety as to be matter of common knowledge and matters within the cognizance of the jury from their own observations").

For these reasons, defense counsel's pointing out this common experience, and asking the jury to infer that the victim was mistaken in her identification, falls well within the ambit

of legitimate argument. This jury argument is no less reasonable or legitimate than asserting, for example, that a person did not clearly see or remember the facial features of the shooter because she was distracted by the noise of the gun and the bustle and excitement of the crowd around her. It is also as valid as arguing that a person did not clearly remember the facial features of her attacker because she was under extreme emotional distress at the time of the attack. I think the majority would accept both of these examples as legitimate argument.

Making these arguments does not constitute misstating a fact to the jury. The lawyer is simply advocating that the jury consider that the identification may be inaccurate for this reason. I am not asserting that the lawyer should be able to make a representation to the jury that empirical studies have been done, without introducing evidence of those studies. Such a representation would be prohibited as a statement of a fact not in evidence. That must be distinguished from what the trial court prohibited here—advocacy that the jury consider whether cross-racial identification of a stranger is harder than intra-racial identification of a stranger.

To be sure, "care must be taken to insulate criminal trials from base appeals to racial prejudice." *Cromedy*, 727 A.2d at 467. Asking a jury to conclude that a white witness may have difficulty in identifying a stranger who was black, however, is not, in itself, a base appeal to racial prejudice. It is simply a recognition of common experiences in visual perception and memory. Naturally, if a party sought to capitalize on the opportunity to mention race in a way that appealed to racial prejudice, the trial court could restrain such conduct. There was nothing in the record to suggest that defense counsel sought or intended to appeal to racial prejudice here.

" 'Summation provides counsel with an opportunity to creatively mesh the diverse facets of trial, meld the evidence presented with plausible theories, and expose the deficiencies in [opposing counsel's] argument.' " *Stevenson v. State*, 94 Md.App. 715, 729, 619 A.2d 155 (1993)(quoting *Henry v. State*,

324 Md. 204, 230, 596 A.2d 1024 (1991), *cert. denied,* 503 U.S. 972, 112 S.Ct. 1590, 118 L.Ed.2d 307 (1992)). Courts should not "stifle creative license" and thereby "prevent counsel from effectively presenting his case." *Id.*

Here, eyewitness identification constitutes the sum total of the State's case-in-chief. To disallow argument challenging the reliability of that identification is unquestionably prejudicial to the defendant. The inherent unreliability of eyewitness identification, which is readily recognized by the majority, simply enhances the likelihood of prejudice to a defendant in these circumstances. *See, e.g., United States v. Wade,* 388 U.S. 218, 228, 87 S.Ct. 1926, 1933, 18 L.Ed.2d 1149 (1967)("[T]he vagaries of eyewitness identification are well-known; the annals of criminal law are rife with instances of mistaken identification").

## Conclusion

For these reasons, I would reverse appellants' convictions and remand the case to the circuit court for a new trial.