THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ANNIE RUTH BIAS, Defendant-Appellant.

Fourth District   No. 4—84—0299

Opinion filed February 26, 1985.

Daniel D. Yuhas and Jeffrey D. Foust, both of State Appellate Defender's Office, of Springfield, for appellant.

J. William Roberts, State's Attorney, of Springfield (Robert J. Biderman and Peter C. Drummond, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE MILLS delivered the opinion of the court:

Armed robbery—jury—six years.

No evidence as to the nature of the instrumentality used to persuade the victim to part with his billfold—except that it *may* have been a sharp fingernail.

Since no portion of the human anatomy is legally a dangerous weapon, we reduce Bias' conviction to simple robbery and remand for resentencing.

Because Bias also asserts that the victim's identification testimony was insufficient to establish beyond a reasonable doubt that she was the robber, a rather detailed summary of the evidence is required.

## EVIDENCE

The State's first witness, Everett Jackson, testified that on December 19, 1983, he went to the Argonne Tavern in Springfield, where he had a couple of beers. After leaving the tavern at about midnight, he went to his car which was parked nearby. He had started his car and was cleaning the frost off the side mirror when he was approached by a black woman who asked, "Do you want a date?" Jackson replied in the negative, and stated that she wasn't his type.

Almost immediately thereafter, the woman said, "Just give me your money then." At that time, the woman, using one hand, pointed something which felt sharp at Jackson's neck. The robber was about one to two feet away from Jackson at the time of the encounter, and the area was lighted to the extent that Jackson could see his assailant.

After Jackson surrendered his wallet, the robber began running in an easterly direction. Jackson gave chase and kept track of the robber by means of her distinctive black and white striped leg warmers. He lost sight of his assailant once during the chase, but soon caught up with her and followed her to the area of a public housing project. Upon arriving at the project, the robber first knocked on the door of an apartment at which no one was apparently home. She then knocked on the door of a second residence, to which she was admitted. Jackson subsequently went to the Springfield police station and reported the robbery.

Jackson first stated that he retrieved his wallet while in pursuit of the robber. He subsequently testified, however, that he was "mixed up" (apparently while testifying) and that he retrieved the wallet after reporting the robbery to the police, because they asked him to retrace his path in pursuing the robber.

Jackson testified that at the time of the robbery, the assailant was wearing white striped leg warmers, a brown stocking cap, and a brown furry coat. He also made an in-court identification of Bias as the robber and stated that, upon viewing her in court, she appeared to be about five feet two inches in height.

A day or two after the robbery, Jackson viewed an array of photographs of possible suspects. After viewing the photographs for approximately two minutes, he identified a picture of Bias as that of the robber. A copy of the array of five sets of photographs which Jackson viewed was preserved, and at trial Jackson identified the first set as those of the robber of whom he had previously made the in-court identification. There was no doubt in Jackson's mind that this was the person who robbed him.

On cross-examination, Jackson stated that on the same day he viewed the photograph array, he pointed out to a detective and to a uniformed police officer the residence which the robber entered. He did not know the address of the residence which he pointed out to them and could not remember whether his identification of the residence took place before or after he viewed the five sets of photographs.

Jackson specifically remembered that the desk sergeant on duty

when he reported the robbery was a female officer, but he could not remember the figures as to the robber's height or weight which he provided the officer who took his initial report on the night of the robbery. Jackson admitted that he did not describe to the investigating officer the length of the robber's hair or the condition of the robber's teeth, and did not state whether the robber had facial scars.

Also on cross-examination, Jackson implied that at the time of the robbery, he was working for the Wyzard Roofing Company from 8 a.m. to 2 p.m. on weekdays and was usually paid every Friday. He further stated, however, that on the day of the robbery he worked at Wyzard's "shop" from 8:30 to 11 a.m. and that on the evening of the robbery, he did some paneling work for a Joseph McGrath from approximately 6:30 p.m. to 10:30 or 11 p.m.

Jackson acknowledged that he really did not know what the object which the robber pointed at his neck was and admitted that it could have been a very sharp fingernail. He pursued the robber for 30 to 40 minutes and the closest he came to the robber while chasing her was about 20 feet. When the woman came up to his car, Jackson apparently looked to the left and had a full-face view of her initially, but he later looked straight ahead. Finally, he testified that he had never been asked to view a line-up and that he knew before he came to court that he would be asked to identify Bias.

On redirect, Jackson stated that he had been paid on the Friday prior to the robbery, but that he had not cashed his check until the following Monday, which was apparently the day of the robbery. He further testified that at the time of the robbery, he was looking up at the robber and that although he waited a minute after the robbery before moving his car, he never lost sight of the robber before beginning to follow her. He reiterated that the robber wore a brown stocking cap, but stated that he could not see what was underneath the cap. Jackson also implied that he was not very good at estimating heights.

On recross, the defense established that Jackson had initially stated to the police that the robber was five feet six inches tall in contrast to his testimony upon viewing Bias in court that she was five feet two inches in height. Furthermore, Jackson admitted that he initially told police that the robber was wearing a brown hat as opposed to a stocking cap. He also acknowledged that the photograph of Bias which he identified showed that she had long hair.

Detective Murphy, of the Springfield police department, testified that he showed Jackson the photo array and that after viewing the photographs, Jackson signed a statement indicating that he had positively identified the robber. Murphy did not in any way indicate to

Jackson the identity of any of the persons depicted in the photographs. The photographs of Bias which Jackson identified were taken in 1982. When he showed Jackson the photographs, Murphy did not know what apartment the robber entered after robbing Jackson, but he did have a reason for selecting the pictures that he did.

Detective Mann, also of the Springfield police department, testified that after talking to Detective Murphy, Jackson pointed out to him the residence in the public housing project which the robber entered. One of the occupants of that residence was Deanna English. Mann was familiar with both English and Bias and had had occasion to see them together. Mann did not, however, enter the apartment on that day, and stated that to the best of his knowledge, no one ever talked to English about the robbery.

The defendant's case began with the testimony of Officer Bivens, who took Jackson's initial report of the robbery. Bivens testified that Jackson described the robber as a black female about five feet six inches in height, weighing 130 pounds. Jackson further stated that she was wearing a three-quarter length brown fur coat, black and white striped pants, and white leg warmers. According to Bivens, Jackson did not provide a description of the robber's facial features, teeth, hair, eyes, voice or shoes. Bivens normally would not expect a robbery victim to take note of the robber's shoes.

Recalled as a defense witness, Detective Murphy stated that no photographs of Deanna English were included in the array which Jackson viewed.

Donald Wyzard, owner of Wyzard Roofing Company, testified that he laid off Jackson during the November preceding the robbery. Jackson did, however, work for him a couple of days in December 1983. The last payroll check which he issued to Jackson prior to the robbery was dated December 2, 1983, and was in the amount of $54.45. Wyzard may, however, have paid Jackson additional cash amounts for odd jobs done for him personally during December 1983. On cross-examination, Wyzard stated that his main reason for laying Jackson off during the winter months was to enable him to collect unemployment compensation.

In rebuttal, the State recalled Jackson. He first stated that he began receiving unemployment compensation about the middle or last of January 1984. He then, however, admitted that he was nervous and that his unemployment benefits actually started in the middle of November 1983. Jackson also retracted his earlier testimony as to having received a paycheck in the middle of December 1983, and stated that upon examining his records, he found that he had received an un-

employment check in the amount of $182 on December 16, 1983, which he cashed on December 19, 1983. He also stated that he most likely did some odd jobs around Wyzard's shop on the day of the robbery, although he was not entirely certain as to this.

Following closing arguments, the jury found Bias guilty of armed robbery.

OPINION

I

■ Bias initially asserts that the trial court erred in failing to instruct the jury as follows:

> "In this case the identifying witness is of a different race than the defendant. In the experience of many it is more difficult to identify members of a different race than members of one's own. If this is also your own experience, you may consider it in evaluating the witness' testimony. You must also consider of course, whether there are other factors present in this case which overcome any such difficulty of identification. For example, you may conclude that the witness has had sufficient contacts with members of the defendant's race that he would not have greater difficulty in making a reliable identification."

However, the court did give the following jury instruction:

> "You are the sole judges of the believability of the witnesses and of the weight to be given to the testimony of each of them. In considering the testimony of any witness, you may take into account his ability and opportunity to observe, his degree of attention at the time of the offense, the accuracy of his earlier description of the offender, the length of time between the offense and the confrontation, his memory, his manner while testifying, any interest, bias, or prejudice he may have, and the reasonableness of his testimony considered in the light of all the evidence in the case."

Bias contends that the former instruction should have been given because of empirical evidence which demonstrates that interracial identifications are much less reliable than intraracial identifications.

In *People v. White* (1978), 58 Ill. App. 3d 226, 374 N.E.2d 250, this court squarely rejected an identical contention. Bias' argument contains no persuasive reasons why we should reverse our decision in *White*, and we therefore decline the invitation to do so. It should further be noted that the majority opinions in two of the cases which Bias cites in support of her position as to this issue, *United States v.*

*Hodges* (7th Cir. 1975), 515 F.2d 650, and *United States v. Telfaire* (D.C. Cir. 1972), 469 F.2d 552, utterly fail to support that position. In neither of these cases did the majority opinion mandate the giving of an interracial identification instruction.

Finally, it should be noted that contrary to Bias' contentions, the empirical studies are not unanimous in concluding that most individuals have greater difficulty identifying members of another race, as opposed to members of their own race. While some studies have concluded that interracial identifications are more difficult than intraracial identifications (*e.g.*, Ellis, Davies & Shepherd, Experimental Studies of Face Identification, 3 National Journal of Criminal Defense 219 (1977)), other studies suggest that this is not necessarily true. (*E.g.*, Malpass & Kravitz, Recognition for Faces of Own and Other Race, 13 Journal of Personality & Social Psychology 330 (1969).) In view of the conflicting empirical evidence, we feel that determination of the propriety of an instruction such as that at issue is better left to committees of the bench and bar as opposed to courts of review. See *United States v. Telfaire* (D.C. Cir. 1972), 469 F.2d 552, 563 (Leventhal, J., concurring).

## II

■ Bias next contends that the identification testimony was insufficient to establish beyond a reasonable doubt that she was the person who robbed Jackson. As basis for this contention, Bias relies on (1) Jackson's focus on articles of the robber's clothing, which were never connected to Bias; (2) Jackson's alleged failure to identify certain of the robber's facial features; (3) the empirical studies which conclude that interracial identifications are more difficult than intraracial identifications; and (4) the contradictions and inconsistencies in Jackson's testimony as to such matters as the robber's height and the source of the check which Jackson cashed on the day of the robbery.

Our analysis of this issue must begin with the premise that credible identification testimony of even one eyewitness is sufficient to support a finding of guilt. (*People v. Jones* (1975), 60 Ill. 2d 300, 325 N.E.2d 601.) The cases so holding do not state that an identification is rendered unreliable simply because the clothing which the victim asserts that an assailant was wearing was never connected to the assailant. To hold otherwise would have the practical effect of virtually precluding the admission of identification testimony when the assailant is apprehended only after he or she has had an opportunity to change his or her clothing. Moreover, minor discrepancies and omissions in a

victim's description of his or her attacker, as to such matters as the presence or absence of a beard, mustache, or tattoo, whether the assailant had missing teeth, and the assailant's height, weight and complexion, do not render an identification utterly inadmissible. *People v. Thomas* (1979), 72 Ill. App. 3d 186, 389 N.E.2d 1330; *People v. Mays* (1976), 38 Ill. App. 3d 182, 347 N.E.2d 235.

■ We are of the opinion that in the case at bar, all of the discrepancies in Jackson's identification testimony are comparatively minor, and that all of the inconsistencies in his identification testimony have a reasonable explanation. First of all, Jackson admitted that he was nervous when testifying, and the jury was in a much better position than we to evaluate the veracity of this statement. Presumably the jury felt that this statement was worthy of belief, and it alone accounts for many of the inaccuracies and contradictions in Jackson's testimony. Also, Jackson's admitted lack of skill in estimating heights and the fact that he viewed the robber only while seated in a car provides a reasonable explanation for Jackson's initially telling investigating officers that the robber was five feet six inches, while stating, after viewing Bias in open court, that Bias was only five feet two inches tall.

Furthermore, it is unreasonable to expect one under the stress of a holdup-type situation to notice whether the robber has missing teeth or scars on her face, or what type of shoes the robber is wearing, especially when the robbery occurs at night under artificial, outside lighting. (*Cf. People v. Hemphill* (1978), 62 Ill. App. 3d 977, 379 N.E.2d 1284 (where defendant has no abnormal or distinguishing physical characteristics, omission of description of facial features from victim's preliminary description of defendant does not raise a reasonable doubt of defendant's guilt).) Moreover, Jackson (whose race, incidentally, does not appear of record) did not testify that he had any greater difficulty identifying blacks as opposed to whites, and in the absence of such testimony, we do not deem the possibility that the identification was interracial to be a crucial factor in evaluating the reliability of Jackson's testimony. Finally, a close examination of Jackson's testimony reveals that he had a plausible reason for wishing to conceal the fact that he was receiving unemployment benefits at the time of the robbery. In view of the existence of plausible explanations for virtually all of the inconsistencies and contradictions in Jackson's testimony, we cannot say that his identification of Bias as his robber is inherently unreliable.

We further note that Bias' reasonable doubt argument is premised on the assumption that Jackson's identification of Bias as his robber

is wholly uncorroborated. This is not so. Detective Mann, who accompanied Jackson when he pointed out the apartment into which the robber fled, stated that one of the occupants of that apartment was Deanna English and that he had had occasion to see English and Bias together. It does not appear that Jackson had any knowledge of the identity of the occupants of the apartment into which Bias fled when he pointed it out to Detective Mann. Jackson's identification of Bias as his robber is thus corroborated by independent evidence that Bias took refuge in the residence of an individual with whom she was known to associate.

In view of what we have just said, both of the cases on which Bias relies in support of her argument that the evidence is insufficient to establish that she robbed Jackson, *People v. Thompson* (1970), 121 Ill. App. 2d 163, 257 N.E.2d 197, and *People v. Marshall* (1966), 74 Ill. App. 2d 483, 221 N.E.2d 133, are distinguishable, for in neither of those cases was there a plausible explanation for the many inconsistencies and inaccuracies in the victim's testimony. Furthermore, in both of those cases, unlike in the present case, the conviction was based *solely* on an uncorroborated identification which the reviewing court deemed less than reliable.

In sum, the inconsistencies and inaccuracies in Jackson's identification testimony are readily explainable, and the identification is buttressed by independent evidence as to the occupants of the apartment in which Jackson stated that the robber took refuge. In our view, this evidence is sufficient to establish beyond a reasonable doubt that Bias is the person who robbed Jackson.

### III

Bias' final contention is that there is no real evidence that a dangerous weapon was used in the robbery and that we should therefore reduce her conviction to robbery. In order for the offense of robbery to be enhanced to armed robbery, the robbery must occur when the defendant "carries on or about his or her person, or is otherwise armed with a dangerous weapon." (Ill. Rev. Stat. 1983, ch. 38, par. 18—2(a).) Where the evidence utterly fails to demonstrate that the defendant was armed with a dangerous weapon at the time of the offense, an armed robbery conviction must be reversed, even where the assailant verbally threatened to use a dangerous weapon at the time of the robbery. *People v. Fiala* (1980), 85 Ill. App. 3d 397, 406 N.E.2d 931.

In the present case, the only evidence as to the nature of the object pointed at Jackson is Jackson's statement that it may have been

a very sharp fingernail. In *People v. Skelton* (1980), 83 Ill. 2d 58, 66, 414 N.E.2d 455, 458, the supreme court implied that a finger cannot be considered a dangerous weapon for purposes of the armed robbery statute. This suggestion is in accord with the virtually unanimous weight of authority in other jurisdictions, which holds that bodily appendages may not be regarded as dangerous weapons for purposes of statutes which enhance criminal offenses if a dangerous weapon was used to commit the offense. See, *e.g., Commonwealth v. Davis* (1980), 10 Mass. App. 190, 406 N.E.2d 417 (human teeth are not a "dangerous weapon" for purposes of statute proscribing assault and battery by means of a dangerous weapon).

We find the State's arguments that the presence of a dangerous weapon may be inferred from the circumstances of the robbery, and the authority cited in support thereof, to be unpersuasive. The State asserts that it is unreasonable to assume that a person of Bias' stature would have attempted an armed robbery unless armed with a dangerous weapon. However, a short person can master karate or one of the other martial arts as easily as a larger person. Furthermore, neither of the cases cited in support of the State's position as to this issue—*People v. Agee* (1980), 85 Ill. App. 3d 74, 405 N.E.2d 1245, and *People v. Elam* (1972), 50 Ill. 2d 214, 278 N.E.2d 76—is on point, since in both of those cases, unlike the present case, a dangerous weapon was either seen by the victim at the time of the robbery or discovered on the person of the defendant shortly after the robbery.

When the possible presence of a very sharp fingernail is disregarded, the record before us does not contain a shred of evidence that any particular type of dangerous weapon was present at the time that Bias robbed Jackson. We therefore reduce Bias' conviction to simple robbery (*People v. Binion* (1967), 80 Ill. App. 2d 130, 225 N.E.2d 485) and remand the cause to the circuit court with directions that the court conduct a sentencing hearing on the simple robbery conviction.

Affirmed as modified and remanded with directions.

GREEN, P.J., and TRAPP, J., concur.