2024 IL App (1st) 211304-U
No. 1-21-1304
Order filed May 10, 2024

Sixth Division

NOTICE: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 14 CR 19585 |
| | ) | |
| WILLIAM GARDNER, | ) | Honorable |
| | ) | Domenica A. Stephenson, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE HYMAN delivered the judgment of the court.
Presiding Justice Oden Johnson and Justice C.A. Walker concurred in the judgment.

**RULE 23 ORDER**

¶ 1     *Held:* The evidence presented at trial was sufficient to support guilty verdicts on charges of first-degree murder with a firearm, aggravated battery with a firearm, and three counts of aggravated assault of police officers where several police officers identified the defendant and a surveillance video plus other circumstantial evidence corroborated the State's theory of the case.

¶ 2     Aaron Feazell was shot and killed as he played dice with a group of men on Chicago's West Side. Another man was shot in the leg. Three uniformed Chicago police officers chased a suspect on foot, but he escaped. About six months later, William Gardner was indicted on charges related to the shooting.

¶ 3    A jury convicted Gardner of first-degree murder with a firearm (720 ILCS 5/9-1(a)(1) (West 2014)); aggravated battery with a firearm (720 ILCS 5/12-3.05(e)(1) (West 2014)); and three counts of aggravated assault of police officers (720 ILCS 5/12-2(b)(4.1)(West 2014)). Gardner received a sentence totaling 70 years in prison. He contends that no rational trier of fact could have found the evidence sufficient beyond a reasonable doubt.

¶ 4    Viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could conclude that Gardner shot and killed Feazell, committed aggravated battery with a gun against Winters, and committed aggravated assault of the police officers who arrested him. We affirm.

¶ 5                              Background

¶ 6    At the time of the shooting, James Shavers, a security guard at an apartment building across the street from where the shooting took place, was monitoring the building's security system, which included a rooftop surveillance camera he controlled remotely. Around 8 p.m., Shavers pointed the security camera at a dice game in front of the building across the street and left his desk to meet a friend in the parking lot. While talking to the friend, Shavers heard multiple gunshots. He ducked for three to four seconds, stood up, and saw a man about 15 to 20 feet away running toward him. Shavers saw the man for five to seven seconds and described him as a black male wearing a black T-shirt, blue pants, and a "wave cap" or "do-rag." Shavers saw a gun in the man's right hand.

¶ 7    The man turned and ran through a vacant lot across the street into a T-shaped alley behind the lot. Shavers focused on the man's face despite feeling nervous and unsure of what was happening. As three uniformed police officers came toward him, Shavers pointed them in the

direction that the man had gone. The officers went a vacant lot where seconds later, the man entered. Shavers estimated that the man was about 65 feet away, and he could see his face and body for about five to eight seconds, noting his clothes, do-rag, and the gun in his hand. The man and the police officers came within 30 to 35 feet of one another. Shavers heard the police yell for the man to stop. The man slid to a stop, turned, and raised a gun at the officers. In response, the officers began shooting. The man fled.

¶ 8      After the shooting and the foot chase, Shavers, his supervisor, and detectives returned to the apartment building to review the rooftop security footage. The recording showed a man wearing a black shirt, blue pants, and a do-rag approach a group playing dice, shoot, and take off. Shavers identified the shooter as Gardner. About a month later, Shavers identified Gardner from a six-person photo array.

¶ 9      On cross-examination, Shavers confirmed that he had neither described Gardner as "dark-skinned" nor told the police about the do-rag on the night of the shooting or in a follow-up interview. Also, although at his grand jury testimony Shavers testified that other people had run toward him obstructing his view of Gardner "a little bit," at trial, Shavers denied they obscured his view.

¶ 10     The officers who chased Gardner—Chicago police officers Stritzel, Ponto, and Sojka—testified. At the time of the shooting, each was a new officer with just over one year of police experience. Toward the end of their lunch break, around 8 p.m., they were in full uniform and sitting at a table close to the apartment parking lot when they heard several gunshots. The officers ran toward Shavers, who pointed to a black man wearing a black T-shirt and bright blue pants and carrying a gun.

¶ 11    Stritzel and Sojka saw the armed man from about 50 to 100 feet away; Ponto saw him from about 75 feet away. Ponto also saw his face, including eyes, eyebrows, the shape of his head, and hairstyle, noting the man had "a distinctive head shape." Likewise, Sojka could see the man's eyes and eyebrows and part of his nose. Sojka noticed the man's "distinct" hairline as a short zigzag "V" pattern. Sojka couldn't see below the man's nose as a mask covered the bottom half of his face. The officers testified that they had a clear view of the man.

¶ 12    The officers rushed toward the man who ran into a vacant lot; they went to another vacant lot alongside it. Seconds later, the man ran into the same lot as the officers. Stritzel said the man was about 30 to 40 feet away. Ponto and Sojka were behind Stritzel and about 50 to 75 feet from the man. Stritzel saw the man for no more than 10 seconds, Ponto for 10 to 12 seconds, and Sojka for about 10 seconds.

¶ 13    Stritzel yelled, identified himself as police, and ordered the man to show his hands. Ponto testified that the man looked surprised to see the officers. All three officers testified that the man stopped and turned, raising his arm to point the gun at them. In response, Sojka and Ponto fired at the man, who ran back into the alley and escaped.

¶ 14    Nearly a month later, the officers separately reviewed photo arrays of potential suspects and identified Gardner.

¶ 15    Chicago police sergeant Russell Egan testified that he could not recall whether Stritzel had told him about the man's dark complexion or whether Sojka described the man's "V" hair pattern. Chicago police detective Vincent Alonzo testified that Ponto did not disclose information about the man's hairline or head size. Alonzo did not recall if Sojka had disclosed the man's height or weight, and his notes after the shooting did not reflect this information.

¶ 16 Wisconsin state trooper Jess Hansen testified that almost four months after the shooting, while patrolling on Interstate 94 outside of Madison, WI, he saw a car pass him with an expired registration and pulled over the driver. Hansen asked for a driver's license, and the driver gave him an Illinois license, identifying him as William Gardner. Hansen was unable to identify Gardner in court.

¶ 17 Gardner told Hansen that he split his time between Madison and Chicago, where he primarily lived. After running Gardner's license, Hansen discovered a warrant for Gardner's arrest. Hansen called for backup. When it arrived, he and two other officers stood about 50 feet back from Gardner's car and drew their weapons before Hansen used the PA system and ordered Gardner to get out of his car. Gardner yelled that he could not understand what they were saying, and Hansen again told Gardner to get out. At that point, Gardner sped away.

¶ 18 The police chased Gardner for a short period at speeds of 80 to 85 miles an hour for a mile or a mile-and-a-half when Gardner turned at an exit, which ended in a roundabout. There, Gardner lost control and stopped on the on-ramp. Gardner was arrested without incident.

¶ 19 Chicago police officer Timothy Lange testified that on May 24, about 8 p.m., he and his partner were on patrol when they received a radio call of shots fired by the police. While walking in the area of the call, Lange and his partner noticed a running car in a vacant lot with the driver's side door open and no one inside. The car, registered to Shavon Beals, was impounded and searched the next day. Police seized a dry-cleaning receipt for "Gardner," a car insurance card with Gardner's and Beals's names, and two cell phones. Cell phone analysis revealed three "selfies" of Gardner.

¶ 20    In the vacant lot through which Gardner had run, police located a twisted black T-shirt and white undershirt and a piece of black nylon. The undershirt and black nylon were preserved for DNA analysis. The Illinois State Police forensic scientist determined not to test the black T-shirt because it was more likely DNA would be on the undershirt worn beneath it. Testing identified major male DNA profiles matching Gardner's DNA on both items.

¶ 21    A forensic biologist also tested the two items, testifying that the frequency of the DNA profile occurring in the general population was one in 530 quintillion.

¶ 22    In the yard next to the vacant lot where police recovered the clothing was a Glock .22 handgun with six remaining rounds. Evidence technicians swabbed the weapon for DNA; the results were inconclusive. An expert in firearms identification testified that the bullets recovered from Feazell's and Winter's bodies and the bullets recovered from the scene matched the discarded gun. Police identified the gun as registered to Terrance Cooper.

¶ 23    Cooper testified that he kept the gun at the home he shared with family members but sometimes he stayed elsewhere. Cooper had given his nephew, Lavontay Bell, permission to use the firearm to protect their home whenever Cooper was not there. On the day of the shooting, at about 8:30 p.m., Bell called Cooper to ask if the gun was registered.

¶ 24    On cross-examination, Cooper said Bell told him that he took the gun and had it when he was shot at outside of a liquor store earlier that evening. Bell said he fired back and had thrown the gun into a yard while being chased by police.

¶ 25    Chicago police detective Melissa Rodriguez testified that she and her partner were driving other officers to rotate with Stritzel, Ponto, and Sojka. While en route, they heard gunshots and someone on the emergency radio broadcast "shots fired" and a description of a black man wearing

dark clothing. About two blocks from the scene, they saw two men fitting the description running north. Rodriguez and her partner stopped the pair, one of whom was Bell. Both men were handcuffed and searched; police found no weapons. After the police transmitted their names to dispatch, they were released. The photo arrays presented to eyewitnesses did not include Bell's photograph.

¶ 26    Cook County Sheriff's Department sergeant Robert Zaccone testified his job duties included maintaining the records tracking visitors to inmates at the Cook County Department of Corrections. Zaccone testified that Bell was approved to visit Gardner and visited him on four occasions. The visitor records include a place for the visitor to describe their relationship to the prisoner and address. Bell listed "friend" and addresses in Chicago and Madison, WI.

¶ 27                                *Defense Testimony*

¶ 28    The defense called two witnesses, Sharron Winters, who had been shot, and Dr. Kimberly Maclin, who was qualified as an eyewitness identification and memory expert.

¶ 29    Winters testified that he got a glance at the shooter. Winters described the shooter as a chubby, dark-skinned black man, 5'10"- 5'11" inches in height. When asked if he saw the man who had shot him in the courtroom, Winters responded that he did not.

¶ 30    Dr. Maclin testified that she reviewed the police reports, grand jury transcripts, and the photo arrays presented to eyewitnesses. She noted that factors such as stress, arousal, opportunity to view the situation, duration of time, distance, cross-cultural identification, and the presence of a weapon can impact an eyewitness's ability to identify someone accurately. Dr. Maclin did not speak to eyewitnesses and could not say with certainty that any of the factors had influenced them.

¶ 31                            *Jury Verdict and Sentencing*

¶ 32    The jury found Gardner guilty of the first-degree murder of Feazell, aggravated battery with a gun of Winters, and three charges of aggravated assault of Stritzel, Ponto, and Sojka. Gardner was sentenced to 35 years in prison for first-degree murder, with an additional 25 years for the firearm enhancement, a consecutive 10-year sentence for aggravated battery of a firearm, and a concurrent sentence of 3 years for the aggravated assault counts, totaling 70 years.

¶ 33                                  Analysis

¶ 34                          *Sufficiency of the Evidence*

¶ 35    Gardner contends that no rational trier of fact could have found the evidence sufficient to prove beyond a reasonable doubt that he shot Feazell and Winters and then was the man police chased. He asserts that Bell's presence, combined with Bell's connection to the murder weapon, demonstrate that no rational juror could have been convinced beyond a reasonable doubt that he was the shooter. Gardner further argues that Shavers's and the three officers' eyewitness identifications were unreliable, and forensic evidence fails to link him to the crime. (We note that Gardner filed a *pro se* motion objecting to his counsel's filing of an amended opening brief but Gardner did not request to represent himself or for his counsel to withdraw. Moreover, his counsel properly amended the opening brief after the State supplemented the record.)

¶ 36    When a defendant challenges the sufficiency of the evidence, the reviewing court must consider, in the light most favorable to the prosecution, whether a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979). The trier of fact resolves conflicts in the testimony, weighs the evidence, and draws reasonable inferences from the facts. *People v. Harris*, 2018 IL 121932, ¶ 26. The reviewing court will not substitute its judgment for that of the trier of facts. *Id*. We reverse for insufficient

evidence only if the evidence "is so improbable or unsatisfactory that a reasonable doubt remains as to the defendant's guilt." *Id.*

¶ 37    To sustain a conviction for first-degree murder, the State must prove that Gardner intended to kill or do great bodily harm to Feazell or knew his acts would cause death. 720 ILCS 5/9-1(a)(1) (West 2014). For aggravated battery with a firearm, the State must prove that Gardner caused Winters's injuries by shooting him. 720 ILCS 5/12-3.05(e)(1) (West 2014). Finally, for aggravated assault, the State must prove that in committing an assault, Gardner knew Stritzel, Ponto, and Sojka were police officers performing official duties. 720 ILCS 5/12-2(b)(4.1)(i) (West 2014).

¶ 38                    *Corroborating/Circumstantial Evidence*

¶ 39    Circumstantial evidence does not require proving beyond a reasonable doubt each link in the chain of circumstances; rather, all the evidence, considered collectively, has to satisfy the trier of fact beyond a reasonable doubt. *People v. Hall*, 194 Ill. 2d 305, 330 (2000). Moreover, "[t]he trier of fact is not required to disregard inferences that flow normally from the evidence" or to uncover "all possible explanations consistent with innocence and raise them to a level of reasonable doubt." *People v. Cline*, 2022 IL 126383, ¶¶ 34, 41. Here, viewing the circumstantial evidence in the light most favorable to the State, as we must, we conclude that the corroborating evidence presented supports the inference that Gardner was the shooter.

¶ 40    In addition to the eyewitness identification testimony, the State presented DNA evidence placing Gardner in the area of both the shooting and police foot chase. Gardner's DNA matched the white undershirt entangled in a black T-shirt and the black nylon material. While not disputing the results of the DNA testing, Gardner insists that the State failed to connect the undershirt to the one worn by the armed man. Given the rooftop surveillance footage showing the shooter wearing

a black T-shirt and the eyewitness descriptions of the man's clothing, the jury could have inferred that in making his escape, the man stripped off his undershirt in the same motion as the black T-shirt, explaining how they got intertwined and logically tracking the forensic scientist's decision to test the undershirt.

¶ 41    As for the black nylon material, eyewitnesses described the man as wearing something like a do-rag, wave cap, or mask over his face. That police recovered the black nylon material in the same location as the T-shirt and undershirt containing DNA matching Gardner's corroborates the eyewitnesses' testimony and supports the inference that it was discarded with and for the same reason as the shirts.

¶ 42    Gardner also was connected to the area of the shooting through the running car with his dry-cleaning receipt, auto insurance information, and a cell phone with selfies. Even if the State's argument the car served as a "getaway" car was "purely speculative," the items inside the car advanced the State's theory by providing additional corroborative evidence of Gardner's proximity to the shooting. From there, the jury could infer Gardner's presence rather than that the discovery of clothing with Gardner's DNA was a coincidence.

¶ 43    Additionally, on the night of Gardner's arrest, his flight from the police, standing alone, does not support a reasonable inference that he was the shooter. Several "well-documented, reasonable, and noncriminal" reasons may explain why a black man pulled over by police in the dark of the night might choose to try and avoid an interaction with police. *People v. Horton*, 2019 IL App (1st) 142019-B, ¶ 7. Yet, Hansen's testimony describes the chase between the troopers and Gardner as just that—a chase. Despite Gardner's efforts to explain the interaction as an attempt to comply with the officers' instructions, we decline to re-weigh this testimony to reach Gardner's

preferred conclusion. The jury heard Hansen's testimony and was free to make its own interpretation.

¶ 44 Furthermore, Gardner argues that the weight of the evidence suggests Bell, rather than Gardner, as the shooter because testimony placed Bell near the shooting and the murder weapon in his hand. But testing on the gun was inconclusive as to DNA. Only Gardner's DNA was on the clothing, and only items belonging to Gardner were in the running car. Despite Gardner's contention that multiple people had been running after the shooting who *could have* had a gun, the evidence established that the man wearing the black T-shirt and blue pants had a gun. The evidence Gardner relies on to bolster this argument is Cooper's testimony about what Bell told him. The jury reached a different conclusion.

¶ 45 And although Bell visited Gardner in Cook County jail, listing an address in Wisconsin, neither the State nor Gardner submitted evidence that demonstrated the visits indicated Bell's involvement in the shooting. These facts imply Gardner and Bell knew one another. In finding Gardner guilty, the jury rejected Gardner's contention that Bell's presence near the shooting and connection with the murder weapon should raise the specter of reasonable doubt in their minds. Given the jury's role as factfinder, they had a greater ability to weigh the credibility of the witnesses. *Harris*, 2018 IL 121932, ¶ 26. We see no reason to disturb the jury's conclusion.

¶ 46 Finally, the only direct eyewitness to the shooting to testify—Winters—did not identify Gardner as the person who shot him. According to police, Winters was "uncooperative" with their attempts to speak with him while in the hospital after the shooting. Winters also declined to view photos or a lineup of suspects. At trial, Winters testified that he had described the shooter to police—that of a chubby, dark-skinned black man, 5'10" to 5'11". Winters also testified that

everything had happened "kind of fast," and he had "a quick glance." Alone that Winters failed to identify Gardner does not undermine the State's case. A reasonable jury could infer that Winters, 17 years old at the time of the shooting, may not have gotten a good look at the shooter because he was shot.

¶ 47    When no eyewitness places a defendant directly at the scene, the trier of fact must consider all of the evidence in reaching the verdict. *People v. Johnson*, 82 Ill. App. 3d 338, 343 (1980). Despite Winters's inability or unwillingness to identify Gardner as the shooter, it remains within the realm of possibility that a rational trier of fact could find Gardner as the shooter based on (i) the four eyewitness identifications, (ii) the rooftop surveillance footage showing the shooter wearing the same clothes identified by the eyewitnesses, (iii) the matching DNA evidence on the clothes, (iv) the running car containing items belonging to Gardner, and (v) Gardner's flight from police at the time of his arrest.

¶ 48    Viewed in the light most favorable to the State, we find that the evidence is not so improbable or unsatisfactory to create a reasonable doubt of Gardner's guilt. See *Harris*, 2018 IL 121932, ¶ 26.

¶ 49                                    *Biggers* Factors

¶ 50    Gardner challenges the testimony of Shavers and the officers identifying Gardner. A single witness's identification can uphold a conviction as long as the witness had an adequate opportunity to view the defendant and the in-court identification is positive and reliable. *People v. Conway*, 2023 IL 127670, ¶ 18 (citing *People v. Slim*, 127 Ill. 2d 302, 307 (1989)). A vague or doubtful identification cannot support a conviction. *Id*.

¶ 51    To evaluate an identification's reliability, courts consider the five factors described by the U.S. Supreme Court in *Neil v. Biggers*: (i) the witness's opportunity to view the perpetrator during the crime; (ii) the witness's degree of attention; (iii) the accuracy of the witness's prior descriptions of the perpetrator; (iv) the witness's level of certainty at the time of identification; and (iv) the length of time between the crime and the identification. *People v. Guerrero*, 2020 IL App (1st) 172156 ¶ 32 (citing *Neil v. Biggers*, 409 U.S. 188 (1972)).

¶ 52    Gardner maintains that under the *Biggers* factors, the identifications could not support his convictions beyond a reasonable doubt. We disagree. A rational trier of fact could have found the identifications reliable in the light most favorable to the prosecution.

¶ 53                                    Witnesses' Opportunity to Observe

¶ 54    Shavers had sufficient opportunity to observe the armed man not once but twice—from 15 to 20 feet for 5 to 7 seconds and from about 65 feet for 5 to 8 seconds. Like Shavers, the officers saw the armed man twice. Initially, Stritzel and Sojka saw him from 50 to 100 feet, and Ponto saw him from about 75 feet. Seconds later, the officers again saw the man as he emerged from an alley into a vacant lot. Stritzel said the man was 30 to 40 feet away for no more than 10 seconds, and Sojka and Ponto, who were behind Stritzel, saw him from 50 to 75 feet. According to Ponto, for 10 to 12 seconds, and according to Sojka, for about 10 seconds.

¶ 55    When considering this factor, courts look at "whether the witness was close enough to the accused for a sufficient period of time under conditions adequate for observation." *People v. Tomei*, 2013 IL App (1st) 112632, ¶ 40 (quoting *People v. Carlton*, 78 Ill. App. 3d. 1098 (1979)). Alone, the brevity of observing will not discredit identification. *People v. Thompson*, 2020 IL App (1st) 171265, ¶ 45. Nor the distance. *People v. Hardy*, 2020 IL App (1st) 172485, ¶ 52.

¶ 56    Given that these eyewitnesses observed the armed man twice in the evening May light at varying distances and lengths of time, this factor favors reliability.

¶ 57                                    Witnesses' Degree of Attention

¶ 58    Shavers and the officers paid sufficient attention. While the stress of a situation can diminish the reliability, testimony about a distraction or other lack of attention is necessary before this factor can weigh against the State. *Hardy*, 2020 IL App (1st) 172485, ¶ 6. While other people running from the shooting may have obstructed Shavers' view of the shooter "a little bit," Shavers said he focused on the man's face. Additionally, while Shavers felt nervous and unsure of what was happening, nothing in his testimony suggests the gun distracted Shavers from focusing on the shooter's face. See *People v. Luellen*, 2019 IL App (1st) 172019, ¶ 69 (finding identification reliable where witness noticed, but did not concentrate on, "bulge" of gun in defendant's possession).

¶ 59    Similarly, each officer had a clear view of the armed man. During the officers' first encounter, the man did not raise the gun toward them, and no officer testified that he feared for his life. While relatively new officers, nothing in Stritzel's, Ponto's, and Sojka's testimony justifies assuming they were too inexperienced or scared or both to provide a reliable identification.

¶ 60    Furthermore, Gardner called an expert in eyewitness identification, offering the jury an opportunity to learn about the difficulties of cross-cultural identification and complications of identification when a weapon is involved. Gardner does not question the jury's failure to incorporate this information into its deliberations.

¶ 61    No direct testimony indicates the identification witnesses were distracted at seeing an armed individual. This factor favors reliability.

¶ 62                                 Accuracy of Previous Descriptions

¶ 63     Next, the identification witnesses gave accurate descriptions after the shooting. An identification stands up even when a witness provides a general description based on the total impression. *Slim*, 127 Ill. 2d at 309. Each witness described a black man wearing blue pants and a black T-shirt consistent with the shooter's clothing on the security camera footage. See *People v. Thompson*, 2020 IL App (1st) 171265, ¶ 46 (description mainly limited to clothing reliable where no evidence of inaccuracy). Gardner's arguments appear to hinge on vagueness, not overall accuracy. Nevertheless, "a witness is not expected or required to distinguish individual and separate features of a suspect in making an identification." *Slim*, 127 Ill. 2d at 308-09.

¶ 64     Specifically, Gardner questions the reliability of the descriptions, given the differences in testimony on identifying features, such as hairstyle and head shape. Gardner also highlights that Shavers did not describe the "do-rag" either immediately after the shooting or later. But omissions or discrepancies in a witness's description, by themselves, do not generate reasonable doubt as long as an identification has been made. *Id.* "Where the witness makes a positive identification, precise accuracy in the preliminary description is not necessary." *People v. Williams*, 2015 IL App (1st) 131103, ¶ 75. Here, Shavers and the officers identified Gardner in a photo array about a month after the shooting and during trial.

¶ 65     Further, Gardner asserts that the failure of the identification witnesses to describe the tattoos on his right arm undermines reliability. But our supreme court has positively cited cases upholding identifications despite a witness failing to mention significant identifying characteristics like a tattoo, facial scar, or missing teeth. *Slim*, 127 Ill. 2d at 309-10 (1989) (citing *People v. Bias*,

131 Ill. App. 3d 98, 105 (1985); *People v. Miller*, 30 Ill. 2d 110, 113 (1964); *People v. Nims*, 156 Ill. App. 3d 115, 121 (1986); and *People v. Mays*, 38 Ill. App. 3d 182, 184 (1976)).

¶ 66    Ultimately, discrepancies and omissions of physical characteristics are not fatal to identification evidence but "simply affect the weight to be given" to identification testimony. *Slim*, 127 Ill. 2d. at 319. As this raises a question of credibility best suited for the trier of fact to assess, the factor also favors reliability.

¶ 67                    Witnesses' Level of Certainty of Identification

¶ 68    Shavers, Stritzel, Ponto, and Sojka identified Gardner in a photo array and in court. While the State asserts that none of them hesitated or appeared uncertain at the photo array and at trial, not one of them was asked about certainty. See *Hardy*, 2020 IL App (1st) 172484, ¶ 60 (noting lack of questioning regarding certainty in declining to weigh this factor for or against reliability).

¶ 69    We have acknowledged a "lack of correlation [exists] between a witness's certainty in his or her identification of someone as the perpetrator of a crime and the accuracy of that identification. (*Luellen*, 2019 IL App (1st) 172019, ¶ 75 (citing *People v. Starks*, 2014 IL App (1st) 121169, ¶ 87 (Hyman, J., specially concurring, joined by Pucinski, J)). And the "spotlighting" problems raised by in-court identifications *Hardy*, 2020 IL App (1st) 172484, ¶ 60.

¶ 70    Thus, this factor neither weighs in favor nor against reliability.

¶ 71                    Length of Time Between Offense and Confrontation

¶ 72    Finally, Shavers, Stritzel, Ponto, and Sojka identified Gardner in a six-person photo array about a month after the shooting. We have upheld convictions of identifications made within similar periods or longer. See, *e.g.*, *People v. Hernandez*, 121 Ill. App. 3d 449, 454 (1984) (identification five weeks after crime); see also *People v. Green*, 2017 IL App (1st) 152513, ¶ 113

(identification three months after crime); see also *People v. Malone*, 2012 IL App (1st) 110517, ¶ 36 (identification more than year after crime). This factor favors reliability.

¶ 73 Any rational trier of fact could accept the identifications of Gardner as reliable.

¶ 74 Affirmed.